**AMERICAN GENERAL INSURANCE COMPANY**

v.

**EQUITABLE GENERAL CORPORATION et al.**

Civ. A. No. 78–0639–R.

United States District Court,
E. D. Virginia,
Richmond Division.

May 5, 1980.

On Motion to Amend June 16, 1980.

Hugh V. White, Jr., R. Kenneth Wheeler, C. Porter Vaughan, III, James E. Farnham, Jack E. McClard, Virginia W. Powell, Hunton & Williams, Richmond, Va., for plaintiff.

M. Scott Hart, Collins Denny, III, Anthony F. Troy, Mays, Valentine, Davenport & Moore, Richmond, Va., for defendants.

## MEMORANDUM

WARRINER, District Judge.

On 12 January 1978, the plaintiff American General Insurance Company (American General), a company incorporated under the laws of and having its principal place of business in the State of Texas, sold to Equitable General. Corporation (Equitable), an insurance holding company incorporated under the laws of and having its principal place of business in the Commonwealth of Virginia, 315,000 shares of stock [1] in Equitable for $32.50 per share. On 26 June 1978, a merger agreement was entered into by Equitable, Gulf Life Insurance Company (Gulf Life), a company incorporated under the laws of and having its corporate headquarters in the State of Florida, and Gulf United Corporation (Gulf United), a company incorporated under the laws of the State of Florida. According to the terms of the merger agreement, the owners of Equitable stock could elect to receive for their stock either $51.00 cash per share or one share of Gulf United $3.78 cumulative convertible preferred stock, Series B.[2] The merger be-

---

1. These 315,000 shares of Equitable stock owned by American General represented approximately 9.9 percent of the then outstanding common stock of Equitable.

2. The merger agreement provided that the holders of no more than 1.3 million shares of Equitable could receive cash for their shares. At the time of the consummation of the merger

tween Equitable, Gulf Life and Gulf United was consummated on or about 11 January 1979 by the merger of Equitable into Gulf Life and the assumption by Gulf Life of the obligations and liabilities of Equitable. Following the merger Equitable ceased to exist as a separate corporate entity.

American General, on 12 June 1978, filed its initial complaint [3] in this action, asserting several claims for relief against Equitable and the individual directors of Equitable [4] based upon the circumstances surrounding the January 1978 sale of Equitable shares. American General alleged specifically that Equitable and its directors, in misrepresenting and failing to disclose to American General prior to the sale of the shares the existence of recent substantive merger negotiations between Equitable and interested acquirer companies as well as the existence and content of certain recent actuarial appraisals of Equitable, was liable to American General upon several legal theories. Such acts and omissions were alleged to have breached the terms of a warranty contained in the Agreement and Mutual Release [5] entered into by Equitable and American General attendant to the sale of the securities, to have violated a Virginia common law fiduciary duty to shareholders, to have violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),[6] and Rule 10b–5 of the Securities and Exchange Commission promulgated thereunder, 17 C.F.R. § 240.10b–5 (1979),[7] and to

---

there were 2,876,272 outstanding shares of Equitable stock.

3. Plaintiff's amended complaint was filed on 19 September 1978. The Court has subject matter jurisdiction over this litigation. 15 U.S.C. § 78aa; 28 U.S.C. § 1332.

4. In addition to Equitable, the complaint also named as defendants Charles E. Phillips, George C. Boddiger, Lloyd A. Brewer, Frank R. Eslinger, Robert Sanders, Henry K. Willard, II, and Leon Chatelain, Jr. Defendant Brewer was dismissed as party defendant per order entered 28 July 1978 upon the agreement of all parties. Mary W. Chatelain, executrix of the estate of Leon Chatelain, Jr., was substituted as a party defendant for Leon Chatelain, Jr., deceased, per order entered 5 September 1979. Finally, Gulf Life was substituted as a party defendant for Equitable, per order entered 8 February 1979. Defendants Sanders, Willard and Chatelain were directors of Equitable but were not otherwise officers or employees of Equitable. Defendant Phillips was a director of Equitable and president and chief executive officer of Equitable. Defendant Eslinger was a director of Equitable and executive vice president of Equitable. Defendant Boddiger was a director of Equitable and president and chief executive officer of Equitable Life, the wholly-owned subsidiary of Equitable. Though Gulf Life was substituted as party defendant the style of the suit and the nominal reference to "Equitable" as the corporate defendant was continued by the parties and the Court.

5. The Agreement and Mutual Release provides, in pertinent part, that:
Equitable represents and warrants to American that it has not reached any agreement or understanding with management of any other company with regard to the acquisition of all or any part of the outstanding common stock of Equitable by such other company and is not now attempting to negotiate or reach any such agreement or understanding.

. . . . .

American and Equitable each hereby releases the other, and each and every individual director of the other, from any and all liabilities, claims and causes of action which it may have against the other, or against any or all of the directors of the other, arising out of or in any manner connected with the purchase, ownership or sale of the Stock by American, excepting only such liabilities, claims and causes of action which may arise under the express warranties, covenants and agreements contained herein.

6. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) provides as follows:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange

. . . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j.

7. Rule 10b–5 of the Securities and Exchange Commission provides as follows:
It shall be unlawful for any person, directly or indirectly, by the use of any means or

have violated the Texas Securities Act, Tex. Code Ann. § 581–33(B) (1978).[8] American General sought rescission of the contract and restitution of the Equitable shares, or, alternatively, damages.

Defendant Equitable filed a counterclaim on 7 September 1978 asserting that American General was liable to Equitable upon several legal theories. Equitable alleged that American General, by representing to Equitable that it was in possession of a firm offer from a third party regarding the 315,-000 shares of Equitable which offer had been accepted by the board of directors of American General subject to American General's first offering the same to Equitable, which offer, it was alleged, had neither then been received nor so preliminarily approved, violated § 10(b) of the Securities Exchange Act of 1934, *supra*, Rule 10b–5 promulgated thereunder, *supra*, the Texas Securities Act, *supra*, and the Virginia Securities Act, Va.Code § 13.1–522(a) (Repl. Vol.1978).[9] Equitable sought damages and an injunction against the collection of the note comprising part of the consideration for the stock transaction.

The case came on to trial to the Court on 10 September 1979. Presentation of the evidence was completed on 21 September 1979, following which the Court delivered preliminary findings of fact from the Bench. Argument was heard on 5 October 1979 relating solely to the issues of the law and damages. Following this hearing, the parties exhaustively briefed the Court on the law applicable to the facts as preliminarily found. This case is ripe for final adjudication.

I

The plaintiff, American General, is a diversified financial services organization engaged almost exclusively in the insurance field. American General is a sophisticated financial investor with a reputation in the insurance industry for the acquisition of smaller, independent insurance companies.

---

instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1979).

8. Section 581–33(B) of the Texas Securities Act provides as follows:

A person who offers to buy or buys a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person selling the security to him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security. However, a person is not liable if he sustains the burden of proof that either (a) the seller knew of the untruth or omission, or (b) he (the offeror or buyer) did not know, and in the exercise of reasonable

care could not have known, of the untruth or omission.

Tex.Code Ann. § 581–33(B) (1978).

9. Section 13.1–522(a) of the Virginia Securities Act provides as follows:

Any person who:

(1) Sells a security in violation of § 13.1–502, § 13.2–504(a), § 13.1–507, § 13.1–510(e) or § 13.1–510(f), or

(2) Sells a security by means of an untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, Shall be liable to the person purchasing such security from him who may sue either at law or in equity to recover the consideration paid for such security, together with interest thereon at the rate of six percent per annum, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of such security, or for the substantial equivalent in damages if he no longer owns the security.

Va.Code § 13.1–522 (Repl.Vol.1978).

Among the persons comprising the management of some insurance companies, American General is viewed with trepidation on the basis of its past willingness to pursue attractive business opportunities by takeover bid, irrespective of the wishes of the target company management.

Equitable was an insurance holding company whose principal asset was Equitable Life Insurance Company (Equitable Life), a regional industrial life insurance company incorporated under the laws of and having its principal place of business in the Commonwealth of Virginia. Equitable had less than 1,000 shareholders; approximately one half of the shares outstanding were controlled in four or five large blocks, although the evidence indicates that the overall fractionalization of shareholding was such that effective control of the corporation by one shareholder was not present.[10]

The management of Equitable in 1977 had been ensconced in the Company for over twenty years. Mr. Charles E. Phillips, president and chief executive officer of Equitable, was largely responsible for the steady growth and success of Equitable during his tenure. Mr. Phillips was clearly in control of Equitable during 1977 and 1978, the period of time during which the operative facts of the case occurred.

By mid-1977, a combination of several factors had set the stage for the facts at bar. Equitable had become very attractive for acquisition either by another insurance company or by an industrial conglomerate.

Not only had Equitable become an attractive company for acquisition, but the general financial atmosphere extant at this time generated substantial interest in the acquisition of companies like Equitable.[11]

During this period a block of Equitable stock approximating ten percent of the outstanding shares of Equitable was held by Commercial Credit Company (Commercial Credit), a subsidiary of Control Data Corporation (Control Data), a company incorporated under the laws of the State of Delaware. Mr. Norris, the president and chairman of the board of Control Data, was of the opinion that the acquisition of one company by another should occur only under congenial circumstances and not by unnegotiated takeover bids. He believed a prospective purchaser should deal with the officers and directors rather than with the stockholder-owners. When it became apparent that Commercial Credit would be unable to reach agreement with Equitable's management to acquire shareholdings in Equitable up to 20 percent of Equitable's outstanding shares, which percentage holding would have entitled Commercial Credit to place that portion of Equitable's earnings on the account books of Commercial Credit as earnings of Commercial Credit by the use of equity accounting,[12] Commercial Credit determined to sell its Equitable holdings. American General was contacted by Commercial Credit and was made an offer relating to the greater part of these shares.[13] Negotiations were successful and the purchase of 315,000 shares by American

10. Certain of these large block shareholders had extremely low tax bases in their holdings; the Willard family, for example, held a block of approximately 10 percent of the outstanding shares of Equitable having a tax basis of six cents per share. Tr. at 1739. The low tax basis has been mentioned frequently as the reason for the interest of Equitable in a cash-and-stock exchange in a potential merger.

11. *See* Tr. at 864–69.

12. Accounting Principles Board Opinion No. 18 governs the use of equity accounting by a shareholder in a corporation desiring to report the earnings of the corporation as earnings of the shareholder, rather than merely report the dividends received on the shares he holds. The use of equity accounting is premised upon the ability of the shareholder seeking to use equity accounting "to exercise significant influence over operating and financial policies of an investee . . . . ." Accounting Principles Board Opinion No. 18, ¶ 17 (1971). The Opinion goes on to raise a presumption that, absent evidence to the contrary, shareholdings of 20 percent or more of the voting stock of a corporation establishes that the particular shareholder has the ability to exercise significant influence over the corporation.

13. This offer related to 315,000 shares of Equitable; leaving 37,666 shares of Equitable still held by Commercial Credit. The block of 315,000 shares constituted approximately 9.9 percent of the outstanding shares of Equitable. American General also acquired an option to

General was consummated in July of 1977. American General purchased these shares of Equitable stock, 9.9 percent of the shares outstanding, with the goal of eventually purchasing sufficient shares for equity accounting whether or not the management of Equitable had objection to this course of action.[14] The immediate goal of American General in the planned acquisition was equity accounting [15]; the long-range goal was complete acquisition.[16]

The purchase of the substantial block of stock by American General was of grave concern to the management of Equitable. Management was familiar with American General's reputation as an acquisitor and was frightened that Equitable would be sought by a company which might by-pass

management and deal directly with the owners. This fear pervaded the management of Equitable despite the existence of years of at least superficially congenial relations between Mr. Woodson, then chief executive officer and chairman of the board of directors of American General, and Mr. Phillips, president and chief executive of Equitable. Moreover, it continued despite the fact that immediately after American General acquired the stock from Commercial Credit, Mr. Woodson contacted Mr. Phillips and told Mr. Phillips that he would be pleased to work out future affiliations between the two companies in an agreeable manner.[17]

Equitable took several steps in response to the purchase by American General.

purchase the remaining 37,666 shares from Commercial Credit if that option were exercised within 90 days of the date of the consummation of the primary transaction. After this period lapsed without American General exercising the option, Commercial Credit contacted Equitable and offered these shares to Equitable. This offer was subsequently accepted and Equitable purchased the 37,666 shares held by Commercial Credit at a price of $26.25 per share. Tr. at 1105–6.

14. See note 12, supra. Section 38.1–178.1:1 of the Virginia Code provides that:
No person shall acquire or seek to acquire control of any domestic insurer whether by purchase of its securities or otherwise, unless such person has previously filed with the Commission and has sent to such insurer an application for approval of acquisition of control of the insurer and the Commission has issued an order approving such application.
Va.Code § 38.1–178.1:1 (Supp.1979).
"Control" is defined as:
[P]ossession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or nonmanagement services, or otherwise, unless the power is the result of an official position with or corporate office held by the person. Control shall be presumed to exist if any person, directly or indirectly, owns, controls, holds with the power to vote, or holds proxies representing, ten per centum or more of the voting securities of any other person. This presumption may be rebutted by a showing made in the manner provided by § 38.1–178.2(i) that control does not exist in fact. The Commission may determine, after furnishing all persons in inter-

est notice and opportunity to be heard and making specific findings of fact to support such determination, that control exists in fact, notwithstanding the absence of a presumption to that effect.
Va.Code § 38.1–178.1(2) (Supp.1979).

15. See note 12, supra.

16. See Tr. at 396–97.
On 2 August 1977, American General filed a Schedule 13D with the Securities and Exchange Commission pursuant to § 13(d)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d)(1). While disclaiming present intent to seek control of Equitable, American General did state that:
American General has in the past analyzed the results of and considered the possibility of acquiring control of . . . [Equitable]. American General may consider seeking representation on the Board of Directors of . . [Equitable] in the future . . . . American General may consider the possibility of acquiring control of . . . [Equitable] in the future . . . . As part of its periodic review of its position in . . . [Equitable], American General may propose . . a merger of similar transaction, or to make a Tender Offer for shares of . . . [Equitable].

17. Mr. Woodson, in a letter to Mr. Phillips dated 27 July 1977, stated that:
[I]f the time should ever come in your affairs or those of your company that you are prepared to discuss an affiliation of any sort, [I earnestly hope that] you will talk with us; and I am very happy that you again this very day reiterated your promise to do so. . .

Counsel was retained to contest the efforts of American General before the State Corporation Commission of Virginia (hereinafter State Corporation Commission) for the requisite approval to permit American General to acquire shareholdings in Equitable in excess of 10 percent.[18] Equitable also consulted with Mr. Webb Hayes, a securities investment lawyer, and several other individuals or firms in the investment field that Equitable thought could help in avoiding a takeover by American General.

On 28 September 1977, Equitable authorized the employment of Mr. Ellis Flinn of the Wyatt Company to complete an actuarial appraisal of Equitable. A draft of this report was delivered to Equitable in November, 1977. At this juncture, Mr. Thomas P. Bowles, of Tillinghast, Nelson & Warren, a consulting actuary, was employed, initially to review and interpret the draft report. Mr. Bowles's responsibilities were later expanded so that he became a general advisor to Equitable in the merger arena and his firm further undertook to perform an additional actuarial evaluation upon Equitable. In late December of 1977, representatives of Equitable stated to a prospective merger candidate, Southwestern Life Insurance Company (Southwestern Life), that the appraisal performed by Bowles's firm indicated an "intrinsic" value for Equitable of $45.00 per share; "intrinsic" in this context meaning a value for Equitable shares based upon a complete sale of the company, not a value based upon a general, 100-share lot market price.

Mr. Bowles's opinion from the beginning, was that merger was in both the short- and long-term interest of Equitable. In his capacity as advisor and agent, Mr. Bowles promoted contacts with possible merger partners for Equitable. Mr. Bowles's responsibility was to locate a "white knight,"[19] to stimulate merger talks with the white knight, to bring such merger negotiations right up to the point of consummation, and then to delay an actual merger pending the outcome of American General's application before the State Corporation Commission. Mr. Bowles's conduct, however, clearly indicates that the afflatus of his advice and counsel was that the merger of Equitable with a suitable company[20] was advisable in any event. Thus, the pervasive claims by Equitable that during this period it wished to remain wholly independent are of questionable validity.

Under Bowles's tutelage Equitable contacted, or was contacted by, eight to ten potential merger partners during the period from July through December of 1977. By the latter part of 1977, Equitable had narrowed the field of merger hopefuls down to two corporations: Liberty National Life Insurance Company (Liberty National) and Southwestern Life Insurance Company (Southwestern Life).

During the last week of 1977, Mr. Woodson, of American General, received several

18. See note 14, supra. The application before the State Corporation Commission was contested successfully by Equitable. Equitable's "success" was largely a result of the fact that the hearings were repeatedly delayed and extended until events overtook and rendered nugatory the business opportunity American General sought. The application of American General before the State Corporation Commission was withdrawn by motion of the applicant following the sale of its shares to Equitable.

19. "White knight" is a word of art used to describe potential merger partners with whom a target company negotiates toward the realization of a merger on terms which the target company management finds acceptable; essentially, the "white knight" is a merger partner who is willing to negotiate the terms of the anticipated merger, while a "raider," is a merg-

er partner who pursues an unnegotiated takeover usually by tendered offer direct to the stockholders. In other words the white knight pursues ownership by means of a "sweetheart deal" with the incumbent management, while a raider deals directly with the shareholders. Thus, the connotation explicit in the appellation is strictly from incumbent management's viewpoint. Tr. at 896–99.

20. A "suitable" company was, by Equitable's standards, one which would deal with Equitable's management rather than go directly to the stockholders with an attractive offer. Such a suitable company must first win the goodwill of incumbent management through offers of job security or other inducements. Hence incumbent management's hostility to "unfriendly" takeover bids.

inquiries from one Beverly Landstreet, an investment banker with Allen C. Ewing & Company of Jacksonville, Florida, concerning the willingness of American General to sell its 315,000 shares of Equitable stock. Mr. Landstreet represented to Mr. Woodson that he, Landstreet, made these inquiries on behalf of a client interested in acquiring 10 percent ownership of Equitable. Mr. Landstreet ultimately proposed a price of $32.50 per share; Mr. Woodson agreed to take such an offer, when formally submitted, to American General's finance committee. Mr. Landstreet did not identify the client he purported to represent.

The Court is convinced that Mr. Landstreet in fact represented Equitable in making his offer. This offer had been generated by Mr. Bowles acting as an agent for Equitable, with the knowledge and consent of Mr. Phillips and Mr. Eslinger and probably of Mr. Boddiger. Mr. Bowles and Mr. Landstreet had been working in close conjunction with one another. Each was thoroughly aware of what the other was doing. Mr. Landstreet was a part of a scheme to determine and to set a price on the stock held by American General so that the stock could be purchased by Equitable. Therefore, the setting of the price of American General's shares at $32.50 a share was a contrivance of Equitable's own making, and as such, cannot serve as a basis for a determination by the Court as to what a third party would have paid for these shares at the relevant time.

American General had become discouraged by the delay that the State Corporation Commission imposed upon its pursuit of additional Equitable shares. The Landstreet offer would result in a satisfactory gain over their original cost.[21] Thus, after considering Mr. Landstreet's proposition, American General determined that the purported offer was at a figure at which American General would sell the 315,000 shares. American General was willing to sell at that figure given the knowledge, incorrect as it turned out, that they had at that time of the affairs of Equitable.

Having determined the Landstreet price was acceptable, Mr. Woodson called Mr. Phillips and offered the 315,000 shares to Equitable at the price of $32.50 a share, the price that Mr. Woodson knew that he could obtain from what he supposed was another buyer. At the time that Mr. Woodson contacted Mr. Phillips, 6 January 1978, Mr. Woodson did not know that Equitable's merger efforts had reached a mature stage. Mr. Woodson was sensible of the fact that the difficulty which American General was experiencing in acquiring the additional stock in Equitable was due in part to Mr. Phillips's ire at Mr. Woodson, and he hoped that by showing this courtesy to Mr. Phillips, Mr. Phillips's attitude toward American General would change so that at some later date American General might be in a favorable position to deal with Equitable's management.

On the day on which Mr. Woodson called Mr. Phillips to offer the shares to Equitable, Equitable had on the table an offer from Liberty National which had been received on 4 January 1978.[22] The offer from Liberty National was an offer in a posture for acceptance by Equitable's board of directors as an agreement in principle, although it is clear that many provisions of a merger would have remained to be complet-

21. American General purchased the Equitable shares from Commercial Credit in July of 1977 for the stated price of $26.25 per share. On a per-share basis, the composition of the full consideration was one-third cash and two-thirds note; the note was to mature in 12 years and bore an interest rate of 6–½ percent. According to Mr. Delaney, the then present value of the consideration in July of 1977, as discounted, was approximately $23.12 per share. Tr. at 389–95.

22. On 4 January 1978, Liberty National presented a proposal for merger with Equitable at an exchange rate of 1.3 shares of Liberty National for each share of Equitable or $33.00 cash per share of Equitable. Attending this meeting on behalf of Equitable were Mr. Phillips, Mr. Eslinger, and Mr. Boddiger. Subsequently, on 6 January 1978, Mr. Frank Samford, chairman of the board of directors of Liberty National, increased the stock portion of the offer made on 4 January 1978 from 1.3 shares of Liberty National stock to 1.35 shares for each share of Equitable stock.

ed after any such an agreement in principle. The offer of 4 January 1978 was at a figure which was within the range that the Equitable merger team considered reasonable. The Liberty National offer, as enhanced on 6 January 1978, nearly approached the figure which Equitable itself had set.[23]

Also on 6 January 1978, and at a time which began before and was completed after the telephone call from Mr. Woodson to Mr. Phillips, Equitable received an offer from Southwestern Life. This offer from Southwestern Life was also within the range which Equitable management considered a reasonable range for merger.[24]

Though Equitable's management thought these offers reasonable the Court finds that Equitable had been ill-advised as to the value of its stock and that the offers from Liberty National and from Southwestern Life were substantially below value. The Court further finds, however, that the management of Equitable was sincerely interested in merger at these price ranges.

On 5 January 1978, Equitable's merger team, consisting of Mr. Phillips, Mr. Eslinger, Mr. Boddiger and Mr. Bowles, held a strategy session in which Mr. Bowles presented to these individual defendants his perceived options for Equitable relating to American General in light of Equitable's merger negotiations. At this meeting it was disclosed to the members of the merger team that the Equitable shares held by American General could be acquired at a price of $32.50 per share; this information having been related to Mr. Bowles by Mr. Landstreet. As noted above, the evidence before the Court shows that Mr. Landstreet's inquiries of American General and

the representations contained therein were in fact generated by Mr. Bowles acting on behalf of Equitable with the knowledge and consent of the merger team.

When Mr. Woodson called Mr. Phillips on 6 January, 1978, he offered Equitable an opportunity to buy back the shares at the precise time at which Equitable had before it offers of merger at prices which were within the range considered by Equitable to be acceptable. Mr. Phillips failed to disclose this information to Mr. Woodson. Had Mr. Woodson known that merger negotiations between Equitable and Liberty National and Southwestern Life were at the mature stage, he would not have made the call to offer the shares. In making the offer to Mr. Phillips, Mr. Woodson did not have knowledge of the material fact of the state of the negotiations between Equitable and Liberty National and between Equitable and Southwestern Life. Mr. Woodson was unaware of the inroads that Mr. Bowles's philosophy of merger had made upon the previously staunch, independent position of Mr. Phillips. Mr. Woodson did not know that he was selling a 10 percent block in a company that easily could be seduced by an appropriate merger approach.

On 7 January 1978, Equitable held a special meeting of the board of directors to formally accept American General's offer to sell its shares. Although all of the individual defendants in this action were present at that meeting, defendant Chatelain's decedent, Leon Chatelain, Jr., and the defendants Sanders and Willard did not otherwise participate in the negotiations with American General either prior to or following this

---

**23.** Of the four members of Equitable's "merger team," Mr. Phillips, Mr. Bowles, Mr. Eslinger and Mr. Boddiger, three members considered the proposal of Liberty National to have been an offer. Mr. Phillips, in notes memorializing a strategy session, held 5 January 1978, noted that "Liberty National has made us an offer verbally"; further, "*[h]ave received an oral offer . . . from one company—Explosive situation*"; Mr. Boddiger, in notes memorializing the session held on 5 January 1978, notes that "L N [Liberty National] has made an offer. Could counterpropose." Mr. Bowles, also in

notes memorializing the strategy session of 5 January 1978, notes that "L N [Liberty National] has offered 1.3 + [$]33.00. Would probably pay 1.4 + [$]33.00." Mr. Eslinger, on the other hand, equivocated in his testimony at trial as to whether the proposal received from Liberty National was an offer and refused to so label the proposals of either Liberty National or Southwestern Life. Tr. at 138–39, 146.

**24.** The offer from Southwestern Life was at a ratio of 1.55 shares for 1 share of Equitable with an alternative $31.50 cash price per share.

board meeting. At this meeting, disclosures were made to the board regarding the status of Equitable's merger negotiations, the receipt of the offers from Liberty National and Southwestern Life, and the existence and substance of the actuarial evaluations which had been performed upon Equitable and which were then in Equitable's possession. The board unanimously resolved to accept the offer of American General upon certain minor specified conditions.[25] Mr. Eslinger, as vice president of Equitable, was authorized by the board to execute whatever additional documents might be necessary in connection with the stock transfer.

Immediately following the 7 January board meeting Mr. Phillips telephoned Mr. Woodson and read to Mr. Woodson a letter which formally accepted the offer of American General.[26] The letter, which Mr. Phil-

lips mailed to Mr. Woodson on 7 January 1978, a Saturday, contained a proposed press release which made no mention whatever of Equitable's recent merger negotiations. It is beyond cavil that American General and Mr. Woodson are sophisticated acquisitors. The mere mention of pending merger negotiations to American General would have been a significant factor in the pricing of their stock. Thus a failure to mention merger was significant.

Mr. Eslinger traveled to American General's home office in Houston, Texas, on 11 January 1978, for the closing of the transaction. That morning a revised press release drafted by Equitable without notice to American General and issued on 9 January 1978 was published in the Southwestern Edition of the *Wall Street Journal.* This press release mentioned that "very preliminary and exploratory" merger talks had

**25.** The minutes of this board meeting reflect that several conditions were imposed upon Equitable's acceptance of American General's offer:

[T]hat . . . [American General] agrees to dismiss all action presently pending upon its application to the Virginia State Corporation Commission, agrees not to renew any such action for such a period as the President of . . . [Equitable] may deem proper, agrees to warrant the marketability of . . . [the Equitable] stock; [and] provided further that mutual releases are obtained from any and all liabilities arising out of . . . [American General's] purchase, ownership and sale of . . . [the Equitable] stock . . . and such other conditions deemed advisable by the officers and attorneys for . . . [Equitable].

**26.** Equitable's letter of acceptance, dated 7 January 1978, provided, in pertinent part, that:

Confirming our telephone conversation today, Equitable General (EG) accepts American General's (AG) offer as follows:

AG will sell to EG and EG will purchase from AG 315,000 shares of EG stock at a price of $32.50 per share. AG will dismiss all actions presently pending upon its application to the Virginia State Corporation Commission and will not renew any such application without the consent of a majority of EG's Directors acting as a Board. AG will release EG and its Directors from any and all liability to AG arising out of AG's purchase, ownership and sale of such shares upon the condition that EG also release AG and its Directors from any and all liability to EG arising out of AG's

purchase, ownership and sale of such shares. . . . The purchase price will be paid 50% in cash at closing and the balance of the purchase price will be evidenced by EG's unsecured promissory note bearing interest at the rate of 6% per annum and due and payable one year after closing. . . . AG and EG each agree to reduce this acceptance of your [American General's] offer to a more detailed document upon the request of either of them.

This letter also included a proposed press release by Equitable which provided as follows:

Mr. C. E. Phillips, President of Equitable General Corporation (Equitable), and Mr. B. N. Woodson, Chairman of the Board of American General Insurance Company (American), announced today that Equitable has accepted American's offer to sell to Equitable the 315,000 shares of Equitable stock which American purchased in July, 1977. These shares represent all of American's holdings in Equitable's stock and represents approximately 9.9% of Equitable's outstanding stock. The price of purchase is at $32.50 per share and settlement is to be held on January 17, 1978. One of the conditions of the agreement of purchase is that American will dismiss all actions presently pending upon its application to the Virginia State Corporation Commission for permission to increase its ownership of stock in Equitable.

The parties have stipulated that the closing market quotation for Equitable stock on 6 January 1978 was $26.50 bid.

taken place in "recent weeks."[27] When the *Journal* story was noted by top management of American General on the morning of 11 January 1978, a hasty reconsideration of the advisability of proceeding with the transaction ensued.

When Mr. Eslinger arrived that morning to close the transaction he was closely questioned about the language contained in the press release. Mr. Delaney, for American General, sought specific and detailed information about the state of Equitable's merger posture. Mr. Eslinger refused to enlarge on the phrase "very preliminary and exploratory." Mr. Delaney, after nearly two days of discussions, came to accept this as a true description. As a matter of fact, it was not. On the 11th and 12th of January 1978, management of Equitable, through its press release and through Mr. Eslinger, stated in effect: "We are not merger prone. We are not going to actively seek a merger with anyone. We have had some merger discussions in the past but they are all over and done with, and they were very preliminary and exploratory." Barely two months later Equitable was to be locked tight with still another suitor, Great Southern Life Insurance Company (Great Southern), in merger negotiations which by the middle of April 1978 resulted in a formal merger agreement.[28]

Unaware of the intentional deception in the press release and in Mr. Eslinger's representations, American General demanded from Mr. Eslinger certain assurances, specifically an escalation agreement and a specific exception from the Mutual Release for potential Section 10b-5 claims. American General was aware of the fact that Equitable's representations that the merger negotiations were "very preliminary and exploratory" might be false and that Equitable's merger posture might be of a substantially different color. Mr. Delaney, however, persuaded Mr. Woodson and Mr. Hook, president of American General, that American General should proceed with the transaction on the assurance that the merger negotiations were in fact very preliminary and exploratory. The transaction was closed on that false assumption on 12 January 1978.[29]

As of 12 January 1978, Equitable was seeking merger. As of this date, Equitable's merger negotiations were not "very preliminary and exploratory"; instead, such negotiations were serious and substantive. Equitable had actually reached a point with at least two companies where an agreement in principle was possible; not only was such an agreement in principle possible, it was the next logical step. Thus, with the knowledge in mind that they might be wrong about their assumptions, American General sought to obtain protection from Equitable from the risks that they were running. Mr. Eslinger refused the escalation proposal and the Section 10b-5 exception. Instead, he offered a warranty.[30] Mr. Eslinger's ability to conceal led American General to desist in its efforts to obtain

27. The parties stipulated that appearing in the 11 January 1978 Southwestern Edition of the *Wall Street Journal* (apparently the morning edition) was an article entitled "Equitable General Will Reacquire Common Stock." This article differed from the press release attached to the letter of 7 January 1978 in one major particular; the following language was included in the 11 January 1978 *Journal* article:

The repurchase agreement would avoid further expensive litigation and lift a 'cloud of uncertainty' that might keep Equitable from affiliating with other companies, Equitable asserted. The repurchase agreement will produce a 'slight reduction' in Equitable's per-share book value, but the purchase price of $32.50 a share still represents a 'sound investment,' Equitable General said.

Equitable General said it has had discussions in recent weeks regarding a possible acquisi-

tion of Equitable General, but emphasized that such discussions have been of a 'very preliminary and exploratory nature.'

28. On 14 April 1978, Equitable announced an agreement in principle with Great Southern at a cash price of $40.00 per share for up to 1.2 million shares or 1 share of Great Southern $3.00 cumulative convertible voting preferred stock for each share of Equitable stock then outstanding.

29. Equitable paid for the American General shares one-half in cash and one-half by a one-year 6½% note. *See* note 24 *supra*, and Tr. at 127–28, 688.

30. *See* note 5, *supra*.

other, more effective, protection and accept the warranty. American General relied upon the false press release and the misrepresentations of Mr. Eslinger. Insofar as the misrepresentation amounted to a non-disclosure, the non-disclosure was relied upon by American General believing that the facts which were not disclosed did not exist. The Court finds specifically that American General exercised due diligence in responding to the questions raised by the press release issued by Equitable on 9 January 1978.

The Court finds further that the nature of the negotiations which had been held by Equitable were contrary to the statement of facts made in the warranty and contrary to the statement of facts contained in the press release, as well as being contrary to Mr. Eslinger's representations and concealments. With regard to the warranty, Equitable had represented to American General that it had:

> not reached any agreement or understanding with management of any other company with regard to the acquisition of all or any part of the outstanding common stock of Equitable by such other company and is not now attempting to negotiate or reach any such agreement or understanding.

As noted above, Equitable on 12 January 1978 was in receipt of two negotiated offers of merger at prices which were within a range that the management of Equitable had determined to reflect the per share fair value of Equitable stock. Mr. Eslinger, as a member of Equitable's merger team, knew that the affirmative representations contained in the warranty were false when he executed the warranty as an authorized agent and officer of Equitable. The warranty was false and thus was breached from the point in time of its execution.

Turning next to the actuarial appraisals,[31] the first actuarial appraisal that was performed on Equitable was done by the Wyatt Company. This report was not a complete, classic actuarial appraisal, but the report sufficiently met actuarial guidelines that an expert in the field, Mr. E. D. Flinn, stated was an adequate basis for a determination of the value of all the stock in an insurance company.

Actuarial appraisals are of substantial value to a prospective purchaser or a prospective seller in making a determination as to the price at which 100 percent or a controlling block of the stock of an insurance company should be sold. As the amount of stock to be bought or sold decreases from a control percentage to a noncontrol percentage, an actuarial evaluation is of lesser significance to a prospective buyer or seller.

The Wyatt Company appraisal was enhanced and expanded by a study and report by Tillinghast, Nelson & Warren. The enlarged study was of additional value in making a determination as to what control of Equitable would be worth to a prospective purchaser.[32] Both the Wyatt Company appraisal and the Tillinghast evaluation, had they been released in the financial atmosphere that existed in the fall and winter of 1977–78, would have materially affected the price of Equitable's shares then on the market. These documents would have been even more material to the price that a sophisticated investor in the insurance stock, such as American General, would buy or sell a 10 percent block of stockholdings.[33]

---

**31.** Mr. E. D. Flinn defined an actuarial evaluation as "a projection of a life insurance company's earnings into the future based on interest, mortality lapses and expenses, and discounting those future profits back to the present time to determine the present value of the company." Tr. at 1814–15.

**32.** The existence and contents of these reports were significant, material, information relating to the sale by American General of the 9.9 percent block of shares in Equitable. Further,

Mr. Eslinger clearly recognized this fact as is indicated by the production of the report by Equitable to Liberty National and the disclosure of its existence to Southwestern Life during Equitable's merger negotiations with these companies. *See* Tr. at 201–12.

**33.** Mr. Harold Sandstrom, an insurance analyst with Kidder, Peabody and Company, testified that the presence of an actuarial appraisal was a significant factor in the evaluation of a corporation. The recent preparation of an actuarial

An acquisitive company, such as American General, to a large extent values transactions in non-control percentage shareholdings in the context of eventual complete control, that being one of their primary business enterprises. Thus, particularly to American General, the Wyatt appraisal and the Tillinghast evaluation would have been of substantial significance in its determination as to the price which it, as a sophisticated acquisitor investor, would be willing to sell its Equitable shares.

Leaving aside the contents of the appraisals, the mere fact that Equitable had obtained appraisal reports was significant. Mr. Phillips had a history of being fiercely independent, unwilling even to consider merger offers. The existence of appraisals would suggest to American General that there had been a change in the posture of Equitable, and that Equitable had shifted its position from being a company opposed to merger to a company susceptible of merger. Since the acquisition of 100 percent of Equitable was the ultimate desire of American General, the fact that Equitable was available, or was even considering being available for merger, was a material factor which would have changed American General's valuation of its Equitable shareholdings.

Substantial testimony at trial was directed toward the issue of what would have happened "if"; if Equitable had disclosed the existence of its serious and substantive merger negotiations; if Equitable had disclosed the existence of the actuarial appraisals; if American General had not sold its Equitable shareholdings, what would have happened? The Court finds that had American General known the state of the negotiations between Equitable and the various merger candidates, or had American General known of the existence of the actuarial appraisals, or had American General possessed the information contained in the actuarial appraisals, then American General would not have sold its Equitable stockhold-

ings in January 1978 at the price of $32.50 per share. The Court finds that American General, under all the testimony presented and evidence brought forward, would have been sensible of the fact that a bidding war for the purchase of Equitable General was a reasonable probability; given the attractiveness of Equitable, the willingness of Equitable to be acquired, the naiveté of Equitable in its pricing of its own stock, and given the fact that two companies in early January of 1978 were actively seeking to purchase Equitable at prices substantially below its value.

Exactly what action American General would have taken in that bidding war is, of course, not capable of assured description. The Court finds, that on the basis of all the evidence presented, American General would have had an opportunity as a result of the financial atmosphere at the time, the interest displayed in Equitable by Liberty National, Southwestern Life, and other companies, and the increased interest which would have resulted upon an appropriate disclosure in the financial press, to have received a substantial benefit from the increase between the price at which it sold its shares to Equitable and the price at which a merger was consummated between Equitable and Gulf Life.

Despite the naiveté of the management of Equitable regarding the value of Equitable, management knew that the existence of and the information contained within the actuarial appraisals and knowledge of the state of the merger negotiations, would be material facts to American General in setting a price. These facts would be material to any reasonable, prudent investor who was contemplating buying or selling an approximately 10 percent block of Equitable shares. Equitable deliberately concealed the existence and the substance of the actuarial appraisals and of the merger negotiations from American General in order to

---

appraisal, particularly by a corporation that has had no history of periodic actuarial evaluation was of especial significance; this fact alone raised the question of whether a company previously independent had changed its view and was instead postured for merger. Tr. at 800–7.

obtain from American General the Equitable shares at a favorable price.[34]

At the board meeting called to consider American General's offer Mr. Phillips iterated his intention to continue merger negotiations.[35] Though the purchase of American General's holdings relieved the immediate pressure to find a white knight, and may have briefly re-inspired Mr. Phillips to remain independent, subsequent events proved that his statement of willingness to continue merger negotiations was sincere. Within the month of January, 1978, Equitable General through Mr. Phillips contacted Liberty National and Southwestern Life to reaffirm Equitable's willingness to negotiate a merger.[36] The Court finds that in fact the state of merger readiness was not substantially changed by Equitable's acquisition of American General's shareholdings. There was instead a continuation of then ongoing merger negotiations which within six months led to the Gulf United agreement in principle, and which in the interim had led to an agreement in principle with Great Southern.[37]

Following shortly after the purchase by Equitable of the American General shares there came a shareholder derivative suit against Equitable filed on behalf of the Steuart Investment Company.[38] The thrust of Mr. Steuart's suit and of his communications to Mr. Phillips and the boards of directors of Equitable Life and Equitable General, was that Mr. Phillips simply should not continue his efforts to avoid merger; that instead, merger was desirable and in the best interests of the shareholders of Equitable. Though the Steuart action was brought in good faith, the truth of the matter is that Mr. Phillips, as noted, had already been brought around to the idea that merger was the best course of action for Equitable to pursue. Thus, the confrontation through which Mr. Steuart sought to force a change in Mr. Phillips's position was unnecessary. Merger strategy had already captured Mr. Phillips and the merger team through the ministrations of Mr. Bowles.

34. The parties have stipulated that the closing market quotation for Equitable stock on 12 January 1978 was $25.50 bid and $26.50 asked.

35. The minutes of the Special Meeting of the Board of Directors of Equitable General of 7 January 1978, the meeting at which the board resolved to purchase the 315,000 shares of Equitable stock held by American General, includes the following notation:

Mr. Sanders asked if the company purchased the stock owned by American General would this mean that management would not consider any other offers of merger. Mr. Phillips stated that this company [Equitable General] would continue to explore the acquiring of ownership of other companies and would be willing to continue its discussion with companies who have recently approached Equitable on the possibility of merger or other form of acquisition. He also stated that management would have an open mind to any other offer received by it that was considered in the best interest of stockholders.

36. On 27 January 1978 Mr. Phillips wrote Mr. Frank P. Samford, Jr., chairman and chief executive of Liberty National, and Mr. William H. Seay, chairman and chief executive officer of Southwestern Life; the last paragraph of these letters provided as follows:

While I am not now inviting the reopening of our discussions on any particular revised basis, I must hasten to say that we feel that your company is an excellent company with whom there may well be some reasonable basis for affiliation in the future. Therefore, we will be glad to consider any new proposal which you may wish to make after you have had the opportunity to assess the changes which have occurred here at Equitable General.

37. See note 28, supra.

38. On 13 March 1978 in the Circuit Court of Fairfax County, Virginia, a shareholder derivative action was commenced by the filing of a Bill of Complaint by the Steuart Investment Company. Mr. Steuart, as a member of the board of directors of Equitable Life Insurance Company, on 16 January 1978 also distributed a copy of a letter to the boards of directors of both Equitable Life and Equitable General, a letter in which Mr. Steuart was extremely critical of the purchase of American General's Equitable shares at the price of $32.50 per share. Mr. Steuart also complained of Mr. Phillips's "caretaker" method of directing the activities of the two companies. Mr. Steuart later wrote Mr. Phillips, on 10 February 1978, and again challenged Mr. Phillips's independent, anti-merger position. The State court action commenced by the Steuart Investment Company was, upon agreement of all parties, dismissed with prejudice on 8 March 1979.

Mr. Steuart did not seriously believe that $32.50 per share was an excessive price for Equitable to pay for the shares held by American General. It was, in fact, a price which was below that which should have been paid at that time.[39]

The bidding war which a sophisticated acquisitor might have expected were he apprised of the facts ensued. For several months several insurance holding companies waged a wooing war over the acquisition of Equitable. Gulf United emerged victorious and Equitable and Gulf United entered into a tentative merger agreement which was announced on 26 June 1978. This agreement was consummated on or about 11 January 1979 by the merger of Equitable into Gulf Life and the assumption by Gulf Life of the obligations and liabilities of Equitable. Public knowledge of the commencement of the instant action by American General occurred shortly after 12 June 1978 and before Gulf United had increased a prior bid to the final merger price of $51.00 per share.

Although difficult of precise calculation, the Court finds that Gulf United's final offer included a component valuing the contingent liability of this suit, which value was not merely nominal. Further, the Court finds that Gulf United may have paid as much as $3.00 per share too much for Equitable, given that Gulf United's main competition in the bidding contest was an all-cash bid, clearly disadvantageous to the almost one-half of Equitable's shareholders who had low tax bases. On the other hand Equitable was finally purchased by Gulf United without dilution of the latter's earnings, a factor arguing against a premise that the price was too high. As Gulf Unit-

ed's offer was stock-plus-cash, however, the Court must conclude after a review of all the evidence and opinions, that Equitable could have been purchased by an exchange offering a $48.00 cash price component per share with the stock alternative offered by Gulf United.

Finally, the Court finds that, had American General not sold its shares of Equitable the bidding war would have ensued nevertheless. American General would have been a bidder. Equitable would have had ten million dollars additional in cash—the purchase price of the American General shares—and Gulf Life could have acquired Equitable with a bid of $46.00 cash per share with a stock alternative of one share of Gulf United $3.48 cumulative convertible preferred stock. Tr. at 2030–61.

## II

Plaintiff prosecuted the instant action against the defendants upon several legal and equitable theories.[40]

### A

Plaintiff first asserts liability based upon a Virginia common law fiduciary duty owed by a corporation to its shareholders.[41] *Adelman v. Conotti Corp.*, 215 Va. 782, 213 S.E.2d 774 (1975); *Wometco Enterprises, Inc. v. Norfolk Coca-Cola Bottling Works, Inc.*, 528 F.2d 1128, 1129 (4th Cir. 1976). The defendants respond that *Adelman* and *Wometco* are inapposite, asserting that the alleged fiduciary duty runs not to individual shareholders of a corporation but rather to a corporation's shareholders as a group or

**39.** Mr. Phillips knew and realized that, insofar as the Steuart suit was aimed at changing his posture on merger, he had already changed, and that merger was inevitable. Insofar as Mr. Phillips recognized that the Steuart suit challenged the price paid to American General by Equitable, Mr. Phillips knew that the suit was perfectly defensible and that he did not have to concern himself with defending price.

**40.** *See* notes 6–8, *supra*, and accompanying text.

**41.** The defendants, as officers and directors of a Virginia corporation, were required to comply with Virginia law governing the relations between a Virginia corporation and its shareholders; thus, if applicable, defendants were bound to comply with the Virginia common law of fiduciary duty as set forth in *Adelman v. Conotti Corp.*, *supra*.

an entity. *See, e. g., Kors v. Carey*, 39 Del.Ch. 47, 58, 158 A.2d 136, 143 (1960).

■ The Court concurs that *Adelman* and *Wometco* are inapplicable to the facts of the case at bar. *Adelman* holds that the same fiduciary duty which prohibits a director from acquiring profit or personal advantage from a transaction in which he is concurrently "under a duty to guard the interests of the corporation" also "applies to the conduct of the officers and directors of a corporation in their dealings with the corporation's stockholders." 215 Va. at 790, 213 S.E.2d at 779. Without exhaustively distinguishing the facts of *Adelman*, it is worthy of note that in affirming that portion of the trial court opinion dealing with fiduciary duty, the Supreme Court of Virginia did not limit that duty simply to the plaintiff shareholders before that court, but rather noted the holding of the trial court that "the . . . members of the Libbie Board had breached their fiduciary *duty to the other stockholders, which included the plaintiffs.*" *Id.* at 789, 213 S.E.2d at 778 (emphasis supplied). *Wometco* merely recites the *Adelman* rule. 528 F.2d at 1129. Thus, the Virginia common law duty owed to the shareholders of Equitable by its directors was not a fiduciary duty inuring to each shareholder in his individual dealings with Equitable, but was rather a duty attaching only to dealings between the officers and directors of Equitable and the shareholders as a class. *Kors v. Carey, supra,* 39 Del.Ch. at 58, 158 A.2d at 140–43.[42]

The individual defendants are thus not liable to the plaintiff upon a theory of common law fiduciary duty.[43]

**B**

■ Plaintiff also asserts that the defendants breached the express provisions of the Agreement and Mutual Release entered into by the parties attendant to the sale of these securities.[44] As has been noted by the Court above, the merger team unquestionably knew that the affirmative representations set forth in the warranty were patently false.[45] Equitable affirmatively represented to American General that Equitable had:

> not reached any agreement or understanding with management of any other company with regard to the acquisition of all or any part of the outstanding common stock of Equitable by such other company and is not now attempting to negotiate or reach any such agreement or understanding.

The warranty was breached when it was given on 12 January 1978 in light of the extant merger readiness of Equitable and the state of merger negotiations between Equitable and its suitors on that date.

**C**

Plaintiff further asserts liability based upon § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), *supra,* and upon Rule 10b–5 promulgated thereunder by the Securities Exchange Commission, 17 C.F.R. § 240.10b–5, *supra.*[46]

■ The requisite elements of an action under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1979), based upon nondisclosure are, (1) duty to disclose, (2) materiality, (3) scienter, (4) causation, and (5) reliance. *Chiarella v. United States,* 445 U.S. 222,

---

**42.** Indeed, in this case while the questioned transaction was disadvantageous to shareholder American General, it was highly advantageous to all the other shareholders as a class.

**43.** The Court in *Kors* observed that:

> [I]t is only in special cases where advantage is taken of inside information and the like that the selling stockholder is afforded relief and then on the basis of fraud . . ..

*Kors v. Carey, supra* at 58, 158 A.2d at 143 (citations omitted). Fraud is the very essence

of the remaining claims of the plaintiff against the defendants; thus, this case falls squarely within the holding of *Kors.*

**44.** *See* note 5, *supra.*

**45.** *See* text at notes 30–31.

**46.** *See* notes 6–7, *supra.* The Equitable common stock sold by American General to Equitable constituted securities as defined in 15 U.S.C. § 78c(a)(10).

100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)[47]; *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449–50, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976); *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 562 F.2d 1040, 1048 (8th Cir. 1977), *cert. denied*, 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978).

In considering *duty to disclose* it is instructive to analyze the duty of a corporate insider in trading for his own account with an uninformed person. This duty to disclose material information in connection with the purchase or sale of the insider corporation's securities, is well-stated in the case of *Speed v. Transamerica Corp.*, 99 F.Supp. 808, 828–29 (D.Del.1951):

> It is unlawful for an insider . . . to purchase the stock of minority stockholders without disclosing material facts affecting the value of the stock, known . . . by virtue of his inside position but not known to the selling minority stockholders, which information would have affected the judgment of the sellers. The duty of disclosure stems from the necessity of preventing a corporate insider from utilizing his position to take unfair advantage of the uninformed minority stockholders. It is an attempt to provide some degree of equalization of bargaining position in order that the minority may exercise an informed judgment in any such transaction.

*Accord SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *Rogen v. Ilikon Corp.*, 361 F.2d 260 (1st Cir. 1966); *Kohler v. Kohler Co.*, 319 F.2d 634 (7th Cir. 1963); *Kardon v. National Gypsum Co.*, 73 F.Supp. 798 (E.D.Pa. 1947).

A corporate insider trading in stock of the corporation for his own account by the use of non-public information is thus under a duty to disclose all material facts to the prospective purchaser or seller. *Chiarella v. United States, supra.*

---

**47.** Mr. Justice Powell, speaking for a plurality of the Court in *Chiarella*, observed:

> That the relationship between a corporate insider and the stockholders of his corporation gives rise to a disclosure obligation is not a novel twist of the law. At common law, misrepresentation made for the purpose of inducing reliance upon the false statement is fraudulent. But one who fails to disclose [real] information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or similar relation of trust and confidence between them.' In its *Cady, Roberts* decision, the Commission recognized a relationship of trust and confidence between the shareholders of the corporation and those insiders who have obtained information by reason of their position with that corporation. This relationship gives rise to a duty to disclose because of 'the necessity of preventing a corporate insider from tak[ing] unfair advantage of the uninformed minority shareholders.' *Speed v. Transamerica Corp.*, 99 F.Supp. 808, 829 (Del.1951).

*Chiarella v. United States, supra* at 227–229, 100 S.Ct. at 1114–1115. Thus, "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak. . . . [A] duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information." *Id.* at 235, 100 S.Ct. at 1118.

> In *Cady, Roberts & Co.*, 40 S.E.C. 907 (1961), the Commission decided that a corporate insider must abstain from trading in the shares of his corporation unless he has first disclosed all material inside information known to him. The obligation to disclose or abstain derives from
>
> "[a]n affirmative duty to disclose material information[,] [which] has been traditionally imposed on corporate 'insiders,' particularly officers,· directors, or controlling stockholders. We, and the courts have consistently held that insiders must disclose material facts which are known to them by virtue of their position but which are not known to persons with whom they deal and which, if known, would affect their investment judgment." *Id.,* at 911.
>
> The Commission emphasized that the duty arose from (i) The existence of a relationship affording access to inside information intended to be available only for a· corporate purpose, and (ii) the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure. *Id.,* at 912, and n. 15.

*Id.* at 226–227, 100 S.Ct. at 1114.

The Federal courts have found violations of § 10(b) where corporate insiders used undisclosed information for their own benefit. *E. g., SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (CA2 1968), *cert. denied*, 404 U.S. 1005 [, 92 S.Ct. 561, 30 L.Ed.2d 558] (1972). The cases also have emphasized, in accordance with the common-law rule, that "[t]he party charged with failing to disclose market information must be under a duty to disclose it." *Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275, 282 (CA2 1975). Accordingly, a purchaser of stock who has no duty to a prospective seller because he is *neither* an insider nor a fiduciary has been held to have *no obligation to reveal material facts. See General Time Corp. v. Talley Industries, Inc.*, 403 F.2d 159, 164 (CA2 1968), *cert. denied*, 393 U.S. 1026 [, 89 S.Ct. 631, 21 L.Ed.2d 570] (1969).

. . . . .

[L]iability [for nondisclosures] is premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction. Application of a duty to disclose prior to trading guarantees that corporate insiders, who have an obligation to place the shareholder's welfare before their own, will not benefit personally through fraudulent use of material nonpublic information.

445 U.S. at 230, 100 S.Ct. at 1115 (emphasis supplied) (footnotes omitted).

■ In the present case, although the individual defendants were not under a State common law fiduciary duty inuring to the individual shareholders of Equitable, *see Kors v. Carey, supra*, it is apparent that the officers and directors with whom the plaintiff dealt were corporate insiders possessed of inside information which they had received by virtue of their official corporate positions. *Chiarella v. United States, supra ; see* 5B Jacobs, The Impact of Rule 10b–5 § 66.02[a] (1979). These defendants, however, were not trading for their own account or with the expectation of individual, personal benefit by virtue of the purchase transaction. *See SEC v. Texas Gulf Sulphur Co., supra* at 848. The retirement by Equitable of the American General shares ultimately did benefit each individual shareholder of Equitable, including these defendants, when the merger activity of late spring 1978 established the value of Equitable's shares to be substantially higher than management of Equitable had previously imagined. This fact cannot, however, support a conclusion that these defendants were trading on their own behalf or for their own benefit when, while representing Equitable in Equitable's stock purchase, they engaged in the course of nondisclosures discussed above. These defendants were under no duty, as insiders trading in their own behalf, to disclose material facts to the plaintiff in connection with the stock purchased by the corporation. *Chiarella v. United States, supra; SEC v. Texas Gulf Sulphur Co., supra* at 848.

■ Federal common law does not establish a fiduciary duty between a corporate insider and an individual shareholder mandating disclosure to a shareholder by an insider when the insider deals with the shareholder not for his own benefit. *Cf. Strong v. Repide*, 213 U.S. 419, 431–34, 29 S.Ct. 521, 525–26, 53 L.Ed. 853 (1909); *see, Chiarella v. United States, supra* at 228 n. 10, 100 S.Ct. at 1114 n. 10; *Pepper v. Litton*, 308 U.S. 295, 307 n. 15, 60 S.Ct. 238, 245 n.15, 84 L.Ed. 281. The holding in *Strong v. Repide*, a pre-act case, was not based solely upon the relationship between a director, *qua* director, of a corporation and an individual shareholder.[48] Although

---

**48.** The Court in *Strong* went to great lengths to base its holding on more than merely the relationship between a director and a shareholder. In *Strong*, the director purchased the shareholder's stock by fraud seeking personal profit from the substantial benefits available to the corporation through certain then-prospective asset sales known only to the purchasing director. The director in *Strong* purchased the shares through an agent; the shareholder who sold the shares, also through an agent, did not know the identity of the ultimate purchaser of the shares. The Court in *Strong* observed:

> That the defendant was a director of the corporation is but one of the facts upon which the liability is asserted, *the existence*

dicta in *Chiarella* indicates that a fiduciary duty between a director and an individual shareholder was established in *Strong,* 445 U.S. at 228 n. 10, 100 S.Ct. at 1114 n. 10, the proper interpretation is to consider *Strong* as a pre-Act insider case premised either upon a fiduciary relationship between an agent and his principal or upon the familiar and above discussed rule against the use of inside information by corporate insiders for their individual benefit. These defendants, as officers and directors, were not under a federal common law fiduciary duty to disclose inside information unknown to the plaintiff-shareholder in the context of the instant stock repurchase. This is not the end of the inquiry, however.

 When corporate officers and directors make representations in the course of transacting and closing a stock purchase from a shareholder which, "in the light of the circumstances under which they . . [are] made," omitted material facts necessary to "make the statements made . . not misleading," they are under a duty to disclose additional information necessary to render their statements not misleading, irrespective of whether they were initially under a duty to make the representations at issue. *First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1314 (5th Cir. 1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55

L.Ed.2d 802 (1978); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. Further, again irrespective of whether a duty to disclose was initially present, affirmative misrepresentations made by corporate officers and directors in the course of transacting and closing a stock repurchase from a shareholder are prohibited by § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5, and are actionable thereunder. *Affiliated Ute Citizens v. United States, supra* 406 U.S. at 152, 92 S.Ct. at 1471; *First Virginia Bankshares v. Benson, supra* at 1314.

Mr. Phillips, in his letter responding to the offer expressed by Mr. Woodson on behalf of American General to sell their Equitable shares, included a press release which was patently false and misleading in omitting reference to merger negotiations. Having ventured to disclose, Mr. Phillips was under a duty to disclose truthfully. Though the 9 January 1978 press release did mention pending merger negotiations, thus supplying the omission, the characterization of the state of the negotiations in the press release of 9 January 1978 as "very preliminary and exploratory" was deliberately false and was intended to be misleading.

In addition to the false and misleading press releases Mr. Eslinger has been found to have misrepresented to American Gener-

---

of all the others in addition making such a combination as rendered it the plain duty of the defendant to speak. He was not only a director, but he owned three fourths of the shares of its stock, and was, at the time of the purchase of the stock, administrator general of the company, with large powers, and engaged in the negotiations which finally led to the sale of the company's lands . . . to the government at a price which very greatly enhanced the value of the stock. He was the chief negotiator for the sale of all the lands, and was acting substantially as the agent of the shareholders of his company by reason of his ownership of the shares of stock in the corporation and by the acquiescence of all the other shareholders, and the negotiations were for the sale of the whole of the property of the company. By reason of such ownership and agency, and his participation as such owner and agent in the negotiations then going on, no one knew as well as he the exact condition of such negotiations.

No one knew as well as he the probability of the sale of the lands to the government. No one knew as well as he the probable price that might be obtained on such sale. The lands were the only valuable asset owned by the company. . . . [B]efore the negotiations for the sale were completed, the defendant employs an agent to purchase the stock, and conceals from the plaintiff's agent his own identity and his knowledge of the state of the negotiations and their probable result, with which he was familiar as the agent of the shareholders, and much of which knowledge he obtained while acting as such agent, and by reason thereof.

The case . . . seems a plain one for holding that, under the circumstances detailed, there was a legal obligation on the part of the defendant to make these disclosures.

213 U.S. at 431–34, 29 S.Ct. at 525–526 (emphasis supplied).

al the state of Equitable's merger negotiations in response to American General's expressed concern over the disclosures quoted in the *Journal* article of 11 January 1978. Mr. Eslinger, while individually under no duty to disclose, both intentionally misrepresented facts relating to Equitable's merger negotiations, and made additional representations not themselves false but which, in light of American General's serious concern for ascertaining Equitable's merger status, were clearly misleading and were so intended.[49] Mr. Eslinger was thus under a duty to disclose to the management of American General sufficient additional facts so that the representations made were not misleading in the context in which they were presented. Mr. Eslinger's false representations of facts were clearly prohibited by § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5, assuming the other requisites are met. The Court will therefore proceed to examine the remaining requirements for liability under the Act.

The standard of *materiality* is set forth by *TSC Industries, Inc. v. Northway, Inc., supra*, as follows:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . . What the standard . . . contemplate[s] is

a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. 27 . . [T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.

426 U.S. at 449, 96 S.Ct. at 2132 (footnotes omitted). The Court has found conclusively that Equitable's failure to truthfully apprise American General of the state of Equitable's merger negotiations and of the existence or content of the actuarial appraisals by the intentional and willful deception of the merger team, was a material omission in the face of the false press release and Mr. Eslinger's affirmative misrepresentations regarding Equitable's merger negotiations. Plaintiff has proven unquestionably that there was "a substantial likelihood that the disclosure of . . . [these facts] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.*[50]

The Supreme Court, in *Ernst & Ernst v. Hochfelder, supra*, held that some form of *scienter*[51] was required as an element of an

---

**49.** That Mr. Eslinger engaged in unqualified misrepresentation is clear: Mr. Eslinger represented to American General that price had merely been discussed in the "very preliminary and exploratory" merger negotiations which Equitable had engaged in "in recent weeks"— in fact Equitable had stated to the merger candidates its range of acceptable prices and was then in receipt of two negotiated offers of merger in that range; Mr. Eslinger represented that he was not familiar with certain of the negotiations which Equitable had held with the various merger candidates—in fact Mr. Eslinger was one of a four-man merger team at Equitable comprised of the president of Equitable, the vice-president of Equitable, the president of Equitable Life and a consulting actuary who had been employed by Equitable to advise management on merger, to stimulate and encourage serious merger negotiations; Mr. Eslinger was intimately familiar with the substance and direction of all of Equitable's merger negotiations; finally, Mr. Eslinger strenuously professed the "very preliminary and exploratory" nature of the merger negotiations—in fact, Mr.

Eslinger knew that the negotiations were serious and substantive and that the "very preliminary and exploratory" language was but a smokescreen designed to mislead American General to its detriment.

**50.** As noted by the Supreme Court in *TSC Industries* "[t]he issue of materiality . . . [is] a mixed question of law and fact, involving . . . the application of a legal standard to a particular set of facts." 426 U.S. at 450, 96 S.Ct. at 2132–2133. This Court has carefully evaluated two weeks of trial testimony and innumerable exhibits and depositions and has come inescapably to the conclusion that a reasonable shareholder, possessed of an approximately ten percent block of Equitable stock, would have placed actual significance on the facts which were misrepresented to and withheld from American General.

**51.** The Supreme Court defined scienter as:

> [A] mental state embracing intent to deceive, manipulate, or defraud. [The Court recog-

action under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. 425 U.S. at 193, 96 S.Ct. at 1380.

Applying these standards to the facts of the case before the Court it is apparent that the requirement of scienter has unquestionably been proven. The merger team, acting on behalf of Equitable, intentionally concealed material facts from American General. Mr. Phillips affirmatively misrepresented the state of Equitable's merger negotiations in the draft press release read to Mr. Woodson over the telephone along with Equitable's acceptance of American General's offer to sell. Mr. Eslinger deliberately and knowingly misrepresented the facts with regard to the merger negotiations as he knew them to be when questioned about the *Journal* article in Houston. It is clear to the Court that, with the intent to purposefully deceive their shareholder, these defendants contrived to acquire the plaintiff's block of stock by artifice. Scienter is proven beyond doubt as to defendants Phillips and Eslinger. It is proven by inference as to defendant Boddiger.

Turning next to the requirements of *causation and reliance*, as noted in *Affiliated Ute*,

[u]nder the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

406 U.S. at 153–54, 92 S.Ct. at 1472 (citations omitted). Since "positive proof of reliance is unnecessary when materiality is established," *TSC Industries, Inc. v. Northway, Inc., supra,* 426 U.S. at 447 n.9, 96 S.Ct. at 2132 n.9, and as causation in fact is established when duty to disclose, materiality, and intentional or reckless failure to disclose are proven, the Court will not exhaustively examine the elements of reliance or causation. The findings of fact above [52] are sufficient to satisfy these requirements. *See Johns Hopkins University v. Hutton,* 326 F.Supp. 250, 258 n.11 (D.Md.1971), *aff'd as to liability,* 488 F.2d 912 (4th Cir. 1973), *cert. denied,* 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974). In any event, this Court is satisfied that the plaintiff did, in fact, rely upon the misrepresentations of Mr. Eslinger in Houston, as well as upon the nondisclosures of the merger team regarding the existence and content of the actuarial appraisals and Equitable's recent receipt of two negotiated merger offers within a price range acceptable to Equitable, which reliance was the cause of the injuries here complained of. Stated differently, in describing the merger negotiations as "very preliminary and exploratory" when they were in fact serious and substantive, the merger team knowingly and for the purpose of deception misrepresented material facts upon which American General reasonably relied.

Insofar as plaintiff's *due diligence* may yet be an element of a claim for relief under § 10(b) of the Securities Exchange

---

nized that i]n certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act.
425 U.S. at 193 n.12, 96 S.Ct. at 1381 n.12. The scienter requirement set forth in *Hochfelder* has been interpreted broadly. *Nelson v. Serwold,* 576 F.2d 1332, 1337 (9th Cir.), *cert. denied,* 439 U.S. 970, 99 S.Ct. 404, 58 L.Ed.2d 431 (1978). *Sunstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1039 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977). Decisions following *Hochfelder* have held that intentional or reckless conduct also satisfies the scienter requirement. *Mansbach*

*v. Prescott, Ball & Turben,* 598 F.2d 1017, 1023–25 (6th Cir. 1979). *Nelson v. Serwold, supra; Sunstrand Corp. v. Sun Chemical Corp., supra.* Thus, " 'actual knowledge of misstatements, irrespective of intent,' fulfills the scienter requirement." *In re Transocean Tender Offer Securities Litigation,* 455 F.Supp. 999, 1010 (N.D.Ill.1978), *quoting* Bucklo, *The Supreme Court Attempts to Define Scienter Under Rule 10b–5: Ernst & Ernst v. Hochfelder,* 29 Stan.L. Rev. 213, 219 (1977).

**52.** *See* notes 33–34, *supra,* and accompanying text.

Act of 1934, *supra*, and Rule 10b–5, *supra*, when the claim asserted relates to the intentional misrepresentation and concealment of material facts, the courts which have addressed the question following *Hochfelder* have differed in their application of this doctrine. *Compare Dupuy v. Dupuy*, 551 F.2d 1005, 1014–20 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977) (plaintiff may recover unless reckless in not investigating "in disregard of a risk known to him or so obvious that he must be taken to [be] aware of it, and so great as to make it highly probable that harm would follow"), *with Holdsworth v. Strong*, 545 F.2d 687, 693 (10th Cir. 1976) *cert. denied*, 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977) (plaintiff's lack of due diligence no bar to action after *Hochfelder* unless plaintiff's actions constituted "gross conduct . . . comparable to that of defendant"), *and Sunstrand v. Sun Chemical Corp., supra, and with Straub v. Vaisman and Co.*, 540 F.2d 591, 598 (3rd Cir. 1976) (due diligence as affirmative defense; plaintiff required only to act reasonably under all facts and circumstances); *also see Dupuy v. Dupuy*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977) (White, J. dissenting from denial of writ of certiorari).

Irrespective of which of these standards is determined to be the law, it is apparent that the plaintiff has proven due diligence. In response to the knowledge which it obtained from the 11 January 1978 article in the *Wall Street Journal*, management of American General questioned Mr. Eslinger intensively upon his arrival in Houston for the closing of the transaction. Mr. Eslinger steadfastly denied what he knew to be true: That Equitable had recently been engaged in and would likely continue serious merger negotiations; that Equitable was then in receipt of two merger offers within a price range which Equitable had deemed appropriate; and that the representations made to American General in the warranty executed by Mr. Eslinger on behalf of Equitable were false at the time they were made. American General, after attempting to protect itself with several defensive devices, decided that Mr. Eslinger was probably telling the truth and on that assumption proceeded to close the transaction. American General's conduct and entry into the closing of the stock transaction was imminently reasonable; it was in fact the antithesis of recklessness. Faced with Mr. Eslinger's representations American General closed the transaction only after intensive questioning and investigation failed to substantiate their concerns. What they did not know was that which they could not reasonably be expected to apprehend: the facile willingness of the merger team to utilize intentional deception to acquire the American General-held Equitable shares.

■ Defendants Phillips, Eslinger, and Boddiger are thus liable to the plaintiff under § 10(b) of the Securities Exchange Act of 1934, *supra*, and Rule 10b–5 promulgated thereunder, *supra*.

■ Defendant Equitable, by breaching the express terms of the warranty contained within the Agreement and Mutual Release entered into attendant to the stock transaction, is liable to the plaintiff upon a theory of breach of contract. This defendant, however, is also liable vicariously for violation of § 10(b) of the Securities Exchange Act of 1934, *supra*, and Rule 10b–5 promulgated thereunder, *supra*. Equitable, as a corporate entity, can act only through its officers and duly authorized agents. The merger team was comprised of officers, directors, and agents of Equitable acting on behalf of Equitable when they engaged in the course of conduct described herein. Caselaw establishes that a corporation may be held liable co-extensively with the officer or employee actually responsible for the fraudulent conduct engaged in while in the course of the employment and while transacting corporate business. *Affiliated Ute Citizens v. United States, supra*, 406 U.S. at 154, 92 S.Ct. at 1472; *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 884 (3d Cir. 1975), *cert. denied*, 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976). *See also Carras v. Burns*, 516 F.2d 251, 260–61 (4th Cir. 1975); *Johns Hopkins University v. Hutton*, 422 F.2d 1124, 1129–30 (4th Cir. 1979); 5

Jacobs, The Impact of Rule 10b–5 § 40.06 at 2–129, 130 (1979).

## D

■ The Texas Securities Act, Tex.Code Ann. §§ 581–4, *et seq.* (Supp.1978),[53] imposes civil liability upon:

[a] person who . . . buys a security . . . by means of an untrue statement of a material fact .or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . . [h]owever, [such] a person is not liable if he sustains the burden of proof that either (a) the seller knew of the untruth or omission, or (b) he (the offeror or buyer) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

Tex.Code Ann. § 581–33(B), *supra.*[54] The enactment of subsection (B) in 1977 was a significant and substantial addition to the Texas Securities Act, which subsection as of this date has yet to be construed in a reported decision. *See generally,* Bromberg, *Civil Liability Under Texas Securities Act § 33 (1977) and Related Claims [Installment 1—Introduction; Registration and Related Violations],* 32A S.W.L.J. 867 (1978); Bateman, *Securities Litigation: The 1977 Modernization of Section 33 of the Texas Securities Act,* 15A Hous.L.Rev. 839 (1978). Section 581–33(B) establishes civil liability for a buyer of securities for his failure to disclose a material fact necessary, in the factual setting of the transaction, so that statements made will not be misleading. Tex.Code Ann. § 581–33(B), *supra.* The buyer, however, may avoid liability if he sustains the burden of proof that "the seller knew of the untruth or omission, or . . . [that the buyer] did not know, and in the exercise of reasonable care could not have known, of the untruth or omission." *Id.* The construction and application of this

**53.** As regards the Texas Securities Act, *supra,* and the application of this Act to the facts of the case at bar, Virginia caselaw on choice of law, although controlling, has not addressed this specific factual situation. The shares of stock represented an intangible personal property right. The contract for sale of the stock was complete upon Equitable's acceptance of American General's offer, which took place by telephone and was confirmed by mail, both originating in the State of Virginia. In Virginia, the validity of a contract formed in another State to convey personalty in that other State is governed by the law of that other State, assuming that no significant policy of the Commonwealth is otherwise impaired. *Woodson v. Celina Mutual Insurance Co.,* 211 Va. 423, 426, 177 S.E.2d 610, 613–14 (1970); *C.I.T. Corp. v. Guy,* 170 Va. 16, 22, 195 S.E. 659, 661 (1938). In this case, however, the parties to the contract to convey these shares intended that the performance of the contract take place in Texas, despite the fact that the contract for sale was completed in Virginia. No Virginia caselaw being on point, this Court must "apply the law of Virginia as . . . [this Court predicts it] would be applied by the Supreme Court of Virginia were the case before it." *Nature Conservancy v. Machipango Club, Inc.,* 579 F.2d 873, 875 (4th Cir.), *cert. denied,* 439 U.S. 1047, 99 S.Ct. 724, 58 L.Ed.2d 706 (1978).

The Second Restatement of Conflicts § 191 provides as follows:

The validity of a contract for the sale of an interest in a chattel and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where under the terms of the contract the seller is to deliver the chattel unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

Restatement (Second) Conflict of Laws § 191 (1971); *also see* Restatement (Second) Conflict of Laws § 244. In the absence of dispositive Virginia law, and in light of the fact that the sale was actually consummated in Texas, the Court will apply the principles set forth in the Second Restatement and hold that the Texas Securities Act is applicable to the claims for relief herein alleged against these defendants.

**54.** Section 581–4(B) provides, in pertinent part, that the term:

"[P]erson" . . . shall include a corporation, person, joint stock company, partnership, limited partnership, association, company, firm, syndicate, trust, incorporated or unincorporated, heretofore or hereafter formed under the laws of this or any other state . . . .

Tex.Code Ann. § 581–4(B) (Supp.1979). The shares of Equitable common stock sold by the plaintiff were securities as defined by Tex.Code Ann. § 581–4(A), *supra.*

portion of the statute are thus a matter of first impression.

Preliminarily, it is worthy of note that the statute addresses the liability only of purchasers or those who offer to purchase; thus, under the facts of this case only the liability of defendant Equitable will be assessed under the provisions of § 581–33(B). Insofar as Equitable is a corporate entity and capable of acting only through its officers and duly authorized agents Equitable is responsible vicariously for the fraudulent conduct of those officers and agents acting on behalf of the corporation in the course of their employment. *Cf. Affiliated Ute Citizens v. United States, supra,* 406 U.S. at 154, 92 S.Ct. at 1472; *Rochez Bros., Inc. v. Rhoades, supra* at 884.

■ The statute requires that the false statement or omission concern a material fact. Materiality is a word of art not used in a vacuum. *See e. g., TSC Industries, Inc. v. Northway, Inc., supra,* 426 U.S. at 449–50, 96 S.Ct. at 2132. Having at hand a technical definition within the field of federal securities regulation, the Texas legislature, it will be presumed, intended to employ the word in that same precise sense. *See United States v. Cuomo,* 525 F.2d 1285, 1291 (5th Cir. 1976); *In re Nissen's Estate,* 345 F.2d 230, 235 (4th Cir. 1965). Therefore, the standard of materiality announced by the Supreme Court in *TSC Industries* is controlling for the purposes of assessing the claim stated pursuant to § 581–33(B). The *TSC Industries* standard of materiality being applicable, the Court will incorporate its previous finding of materiality as to the misrepresentations and omissions of Equitable, hold the standard of materiality satisfied on the facts of this case, and consider whether the remaining requirements of § 581–33(B) have been established.

■ From an examination of the statute, it appears that the requirement of scienter, as it has been defined by *Hochfelder,* is not required by § 581–33(B). *Cf. Ernst & Ernst v. Hochfelder, supra,* 425 U.S. at 209 nn.27–28, 96 S.Ct. at 1388 nn. 27–28. Section 581–33(B), by its terms, permits the defendant to avoid liability if he proves that he "did not know, and in the exercise of reasonable care could not have known, of the untruth or omission." The reasonable care defense is inconsistent with the scienter requirement as established in *Hochfelder.*[55] Where a plaintiff proceeding under this section proves intentional, fraudulent conduct, the defendant, by the statute's terms has no defense. Where a plaintiff likewise proves reckless conduct, the due care defense is also of no avail, for conduct which is an "extreme departure" from ordinary standards of care cannot simultaneously admit to a finding of reasonable care. *See Franke v. Midwestern Oklahoma Development Authority,* 428 F.Supp. 719, 725 (W.D.Okl.1976). But where a plaintiff can prove only negligence, without intentional or reckless conduct, the defendant can prevail if he can establish his own exercise of due care. Scienter thus is not required under § 581–33(B). This analysis is somewhat academic, however, in that under the facts of the present case, the plaintiff has already proven scienter on the part of the merger team and, vicariously, Equitable; the due care defense is of no avail to these defendants.

As to the elements of causation and reliance, *Affiliated Ute* will be accepted by this Court as supplying the controlling considerations:

**55.** *See* note 51, *supra* and accompanying test. The Commentary on § 581–33 by the Committee on Securities and Investment Banking of the Section on Corporation, Banking and Business Law of the State Bar of Texas provides a useful source of *legislative history which does not contradict this interpretation. See* Tex. Code Ann. § 581–33, *supra,* Comment to 1977 Amendment. The reasonable care defense, cited by the Commentary as the due diligence defense, is conceptually at odds with a scienter requirement. *See e. g. Holdsworth v. Strong, supra* at 693. In the context of § 581–33(B) a due diligence defense is provided for by the statute; as was noted in *Holdsworth*:

> [i]f plaintiff must prove scienter and at the same time defendant is allowed to defend . . . [on the basis of due diligence] the general effect on the [statutory] remedy is of great magnitude and the action lies only in an extraordinary case.

*Id.*

[u]nder the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of . . . [his] decision. . . . This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

406 U.S. at 153–54, 92 S.Ct. at 1472. Thus, as materiality and failure to disclose are present in the instant case, reliance and causation, insofar as they may be necessary elements of the cause of action under § 581–33(B), are established under the facts of this case.

Further, with regard to the imposition of liability upon defendant Equitable, the Court notes that not only did the corporate defendant not prove that the plaintiff knew of the instant falsehoods and omissions or that Equitable did not know or could not reasonably have known of the falsehoods and omissions, rather, the evidence reveals that neither of these facts could have been proven in this case. American General was clearly unaware of Equitable's merger status as of 12 January 1978; in fact, the Court has found that had American General known the facts regarding Equitable's merger status, American General would not have consummated the transaction at a price of $32.50 per share. The Court has amply discussed the state of mind of the merger team; the defendants on that team clearly knew the precise nature of the falsehoods and omissions for which they were responsible.

■ The conduct of Equitable's officers and agents thus satisfies the necessary elements for liability under § 581–33(B) of the Texas Securities Act, *supra*. Defendant Equitable is therefore liable under § 581–33(B) of the Texas Securities Act.

### III

■ The defendants assert that the general release contained in the Agreement and Mutual Release entered into between American General and Equitable attendant to the stock transaction released Equitable and its officers and directors "from . . . all liabilities . . . and causes of action which . . . [American General] may have [had] against" these parties.[56] Therefore, aside from the question of Equitable's breach of the warranty contained in the Agreement, the issue presented is whether the instant release is effective to avoid liability under § 10(b) of the Securities Exchange Act of 1934, Rule 10b–5 promulgated thereunder, and the Texas Securities Act. The governing standard is set forth in *Goodman v. Epstein*, 582 F.2d 388, 403–5 (7th Cir. 1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979).[57] *Good-*

---

**56.** *See* note 5, *supra*.

**57.** The Court is mindful of the position taken by the Ninth Circuit, that a release is effective to bar only claims which were known to exist at the time of the execution of the waiver, *see, Hughes v. Dempsey-Tegeler & Co.*, 534 F.2d 156, 174–75 (9th Cir.), *cert. denied*, 429 U.S. 896, 97 S.Ct. 259, 50 L.Ed.2d 180 (1976); *Royal Air Properties, Inc. v. Smith*, 333 F.2d 568, 571 (9th Cir. 1964), and is aware that the defense of release is viewed with strong disfavor in securities cases. *Fox v. Kane-Miller Corp.*, 398 F.Supp. 609, 624 (D.Md.1975), *aff'd* 542 F.2d 915 (4th Cir. 1976). This Court is convinced, however, that the holding in *Goodman* provides the appropriate means by which to strike a balance between "the policy requirements of the federal securities laws and needs of judicial economy." 582 F.2d at 403.

The requirement that a person exercise reasonable inquiry to discover possible matured claims existing at the time of execution of a waiver does nothing to defeat the general policy against the *in futuro* waiver of securities claims. *See, e. g., Wilko v. Swan*, . . . [346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953)]. Quite to the contrary, it insures that the signing of a waiver is something that will not be undertaken lightly, with the expectation that the waiver will be unenforceable even as to existing claims because the party executing the waiver kept his eyes closed, and therefore did not 'know.' Such a 'reasonable inquiry' policy also favors the *honest* settlement of claims which is recognized as essential to the continued functioning of our judicial system. *See, e. g., Mittendorf v. J. R. Williston & Beane, Inc.*, . . . [372 F.Supp. 821, 835 (S.D.N.Y.1974)].

*man* holds that a general release of all claims arising under federal securities laws is effective with respect to all claims of which the parties had actual knowledge at the time or of which the parties would have discovered upon reasonable inquiry at the time of release. *Id.* The Court in *Goodman* noted, however, that:

> 'reasonable inquiry' will . . . differ from situation to situation. . . . [I]t may involve only the questioning of the person or persons seeking the release; *any deception by those persons at that point could amount to fraud in the procurement of the release, which would clearly have invalidated the release .* . .

*Id.* at 404 (emphasis supplied).

■ In the present case, the Court has found that the plaintiff exercised due diligence in inquiring into the existence of potential misrepresentations and material omissions by questioning Mr. Eslinger immediately before the stock transaction was closed. The misrepresentations of material facts, had there been no release, would establish liability in this case; the mere presence of a general release purporting to relieve each defendant of all liability connected with this transaction is not dispositive. In this case, the plaintiff was the victim of deliberate misrepresentation and intentional concealment of material facts when the release, as part of the closing documents to the transaction, was executed. As found above, the plaintiff exercised due diligence in seeking to ascertain the truth of the matters represented by Mr. Eslinger. In this factual matrix, given the willingness of Mr. Eslinger to misrepresent facts and to conceal the existence of facts which have been determined to be material, in the face of a duty to disclose the same, the diligence exercised was insufficient to reveal the material facts which had been concealed. As a

*Id.* at 404 (emphasis in original).

Nor is *Virginia Impression Products Co. v. SCM Corp.*, 448 F.2d 262, 265–66 (4th Cir. 1971), *cert. denied*, 405 U.S. 936, 92 S.Ct. 945, 30 L.Ed.2d 811 (1972), to the contrary; there the Fourth Circuit observed that:

result of the deception and the plaintiff's concurrent due diligence the release must accordingly be held to be ineffective to bar the imposition of liability upon these defendants based upon violations of § 10(b) of the Securities Exchange Act of 1934, Rule 10b–5, and § 581–33(B) of the Texas Securities Act. *See Goodman v. Epstein, supra* at 403–4.

### A

■ Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), imposes joint and several civil liability upon "[e]very person who, directly or indirectly, controls any person liable under any provision of . . . [15 U.S.C. §§ 78a *et seq.*] or of any rule or regulation thereunder . . . ." 15 U.S.C. § 78t(a). Rule 405 defines control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405(f) (1979). Caselaw has defined control as the ability to exert influence, directly or indirectly, over the decision-making process of another person. *See Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 884 (3d Cir. 1975), *cert. denied*, 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976). In addition to meeting the test for controlling person, a state of mind evidencing culpability beyond negligence must also be proven before liability attaches. *Carpenter v. Harris, Upham & Co.*, 594 F.2d 388, 394 (4th Cir. 1979). A controlling person may defend the assertion of liability under the Act by proof that "the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

■ Controlling person liability under the Texas Securities Act is established by § 581–33(F) which provides as follows:

> The law imposes no obligation on a party to a general release, dealing at arms length, to reveal all the possible legal theories that the other may possibly use against him. The law merely requires one to reveal material facts if they are unknown to the others.

448 F.2d at 265–66 (citation omitted).

A person who directly or indirectly controls a . . . buyer . . . of a security is liable under Section . . . 33B . . . jointly and severally with the . . . buyer . . . and to The same extent as if he were the . . . buyer . . . unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of facts by reason of which the liability is alleged to exist.

Tex.Code Ann. § 581–33(F)(1), *supra.* The Commentary to this section provides that "[c]ontrol is used in the same broad sense as in federal securities law. . . . Depending on the circumstances, a control person might include an employer, an officer or director, [or] a large shareholder . . . . The rationale for control person liability is that a control person is in a position to prevent the violation . . . ." Commentary, *supra* at p. 43. The Court has found no reported decisions construing this subsection. Considering that the language of the statute tracks that contained in the federal statute, and the Commentary so suggesting, the Court will interpret the Texas statute to impose the same requirements as are established under the federal provisions.

The individual defendants, by virtue of their positions as directors of Equitable, clearly possessed the "power to direct or cause the direction of the management and policies" of Equitable through actions as directors, thus these defendants are *prima facie* controlling persons of Equitable. *Dyer v. Eastern Trust and Banking Co.,* 336 F.Supp. 890, 915–16 (D.Me.1971); *see also, Holmes v. Bateson,* 434 F.Supp. 1365, 1384 (D.R.I.1977), *aff'd as to liability,* 583 F.2d 542 (1st Cir. 1978). The focus of the Court, then, is upon whether "the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action," 15 U.S.C. § 78t(a), or whether these persons instead possessed the culpable state of mind necessary to evidence meaningful participation in the deceptions present in this case. *Carpenter v. Harris, Upham & Co., supra.*

With respect to the defendant members of the merger team what has been said heretofore is sufficient to show their controlling person liability. A brief review of their individual culpability would not be amiss, however. The Court has found that Mr. Phillips was aware of and was a motivating force behind Equitable's misrepresentations and nondisclosures of material facts in connection with the repurchase of American General's stock. The Court concludes that Mr. Phillips directly induced the actions which constitute the basis for the plaintiff's claim for relief in this action; further, Mr. Phillips was not acting in good faith with respect to his participation in and direction of these actions, but was motivated by an ambition to rid Equitable of a significant shareholder with the goal of maintaining his personal control over impending merger negotiations. Therefore, in light of these findings and the holding of defendant Equitable liable under § 10(b) of the Securities Exchange Act of 1934, the Court further holds that defendant Phillips is liable under the controlling person provisions of the Securities Exchange Act of 1934, and the Texas Securities Act.

The Court has previously found that Mr. Eslinger was instrumental in Equitable's misrepresentations and its willful failure to disclose material facts to American General in connection with the stock transaction. Mr. Eslinger, in Houston, misrepresented material facts and deliberately concealed facts which were material which Mr. Eslinger had then become under a duty to disclose. Mr. Eslinger was knowledgeable of the significance of the facts which were withheld and was aware of the concealment for which he was responsible. Mr. Eslinger has previously been found to have met the scienter requirement by his deliberate misrepresentations and active concealment of material facts. The Court concludes that Mr. Eslinger was not acting in good faith with respect to his actions, but was motivated by a desire to rid Equitable of a large shareholder with the goal of maintaining his favorable position with the company.

Therefore, in light of these findings and the holding of defendant Equitable liable under § 10(b) of the Securities Exchange Act of 1934, *supra*, the Court further holds that defendant Eslinger is liable under the controlling person provisions of the Securities Exchange Act of 1934, *supra*, and the Texas Securities Act, *supra*.

Mr. Boddiger, during the relevant period, was a director of Equitable and was the president of Equitable's wholly-owned subsidiary and principal asset, Equitable Life. Although Mr. Boddiger was a member of Equitable's merger team, his testimony under oath claimed that he was completely unaware of the fact that Mr. Bowles, acting on behalf of Equitable, had generated the $32.50 so-called third-party offer. The Court does not credit this disclaimer. Mr. Boddiger's explanation of his part in preparing the press release, his characterization therein of the merger negotiations as "very preliminary and exploratory" when in fact he knew them to be serious and substantive, his presence at almost all the meetings at which the Equitable strategy was devised, and the fact of his membership on the merger team in the context of the evidence in this case leads the Court to the inevitable conclusion that Mr. Boddiger was a full participant in the scheme. Indeed, the Court must admit, the demeanor of Mr. Boddiger on the witness stand, his shallow explanations of inconsistencies, his use of words to obscure rather than reveal, influence the Court substantially in its belief that Mr. Boddiger's protestations of innocence are false.

Mr. Boddiger could not have failed to see what was there to be seen, nor failed to have heard that which was spoken, nor failed to comprehend that which was comprehensible. Being in the position he was in, president of Equitable Life, a director of Equitable, a member of the merger team, he cannot escape liability by unsatisfactory explanations and suggestions of naiveté.

He was an active and knowledgeable participant in the effort to mislead American General. He is thus liable on the same basis as Messrs. Phillips and Eslinger.

## B

The Court will next address the liability of the outside directors: Mr. Chatelain, Mr. Sanders, and Mr. Willard.

Mr. Chatelain, from the evidence presented was an honorable and decent man, though due to advanced age and bad health, he was no longer a good businessman. From Mr. Willard's testimony, it appears that Mr. Chatelain was approximately seventy-six, and suffered from physical infirmity to such an extent that he was not totally aware of what was occurring around him. Mr. Chatelain was, however, a director of Equitable and attended the 7 January 1978 board meeting at which the purchase of American General's shares of Equitable was authorized. Mr. Chatelain did not participate in any negotiation with American General nor in any of Equitable's merger negotiations with Liberty National or Southwestern Life. From the testimony of Mr. Sanders and Mr. Willard, the Court concludes that Mr. Chatelain was completely unaware of the facts upon which the liability of defendants Phillips, Eslinger, Boddiger, and Equitable is based. Considering the scienter requirement further, in light of the standard of recklessness, the Court concludes that Mr. Chatelain, by not ascertaining the facts which existed in late 1977 and early 1978, did not engage in conduct which was "an extreme departure from the standards of ordinary care . . . [presenting] a danger of misleading . . . sellers that . . . [was] either known to . . . [Mr. Chatelain] or . . . so obvious that . . . [he] must have been aware of it." *Franke v. Midwestern Oklahoma Development Authority, supra* at 725.[58]

---

**58.** Mr. Willard testified with regard to Mr. Chatelain as follows:

 Q To your knowledge, did Mr. Chatelain know anything more about the merger discus-

sions or actuarial appraisals of Equitable General than you did?

 A Mr. Hart, it was often my privilege to drive Mr. Chatelain home after our board meetings. His wife would bring him out or the

Mr. Sanders during the relevant period was also a director of Equitable General and Equitable Life. Mr. Sanders was a retired aeronautic consultant and not a knowledgeable insurance man. Mr. Sanders did attend Equitable's board meeting of 7 January 1978 at which the board authorized the repurchase from American General of the shares in issue. Mr. Sanders did not participate in any negotiations with either American General concerning the transaction between American General and Equitable or between potential merger partners of Equitable in the fall of 1977 or early 1978. Mr. Sanders was not aware of the misrepresentations and nondisclosure of facts which have been held to be material. Mr. Sanders relied upon the officers of Equitable to transact the sale in accordance with law and had no suspicion that the transaction would not be or was not so transacted.

The Court concludes that Mr. Sanders was wholly unaware of the facts which supply the basis for the imposition of liability of defendants Phillips, Eslinger, Boddiger, and Equitable; further, examining the conduct of Mr. Sanders in light of the recklessness standard for scienter, the Court concludes that Mr. Sanders, by not ascertaining the facts which existed in late 1977 and early 1978 did not engage in conduct which was "an extreme departure from the standards of ordinary care . . [presenting] a danger of misleading . . sellers that . . . [was] either known to . . . [Mr. Sanders] or . . . so obvious that . . . [he] must have been aware of it." *Id.*

Mr. Willard, during the relevant time, was also a director of Equitable General and Equitable Life. Mr. Willard by occupation was a commercial banker and was not a knowledgeable insurance man. Mr. Willard attended the board meeting of Equita-

ble held 7 January 1978. Mr. Willard testified that he had had vague knowledge of Equitable's merger negotiations prior to the 7 January board meeting, but was not privy to the facts developed in such negotiations and further had not been involved in the negotiation with American General for the repurchase of the Equitable shares. Mr. Willard also testified that he relied upon the officers of Equitable to complete the transaction in accordance with law and was not otherwise aware of the misrepresentations or nondisclosure of material facts by Equitable through its officers.

For the reasons above mentioned in the case of Mr. Sanders, there is an absence of liability on the part of Mr. Willard.

The element of scienter having not been proven with respect to these defendants, Mr. Chatelain, Mr. Sanders, and Mr. Willard, liability accordingly will not lie under § 10(b) of the Securities Exchange Act of 1934, *supra*, or Rule 10b–5, *supra*. *Ernst & Ernst v. Hochfelder, supra* ; *Sunstrand Corp. v. Sun Chemical Corp., supra* ; *Franke v. Midwestern Oklahoma Development Authority, supra.* Further, absent the requisite element of scienter or any evidence of culpable conduct whatever, these defendants cannot be held liable as controlling persons under § 20(a) of the Securities Exchange Act of 1934, or § 581–33(F)(1), (2) of the Texas Securities Act.

### C

As regards defendant Equitable's counterclaim, the Court finds there was no misrepresentation or omission made by Mr. Woodson to Mr. Phillips in conveying the offer of American General to Equitable, much less a misrepresentation or omission relating to a material fact. *TSC Industries,*

---

company car would go get him, and Mr. Chatelain at the time was a gentleman of 76 years old suffering from Parkinson's disease, and really sliding downhill physically. He was a sick man. So I would drive him home. I could tell from our discussions that Mr. Chatelain really did not know what was—I could be charitable about it—he did not know what was going on, really. He

had no idea what the sequence of events or anything. I'm sure he knew nothing about any merger negotiations. He was a sick man, a failing man.

Q To your knowledge, then, did he know anything about what was told to American General or not told to American General?

A I'm sure he knew nothing.

Tr. at 1754–55.

*Inc. v. Northway, supra,* 426 U.S. at 449–50, 96 S.Ct. at 2132, *see* Tr. at 681–89, 716–24. Mr. Woodson did not represent to Mr. Phillips that American General was in possession of a firm offer from an undisclosed third-party, which offer had been tentatively accepted by the board of directors of American General; rather, Mr. Woodson explained to Mr. Phillips that he had received inquiries from a reputable broker who had represented to Mr. Woodson that he, the broker, represented a client who would pay $32.50 per share for Equitable and, further, Mr. Woodson indicated that American General, or rather Mr. Woodson, as a matter of courtesy between the companies, felt it to be appropriate to offer the shares first to Equitable at that price, $32.50 per share. No material misrepresentation or omission having been made, defendant Equitable's counterclaim under § 10(b) of the Securities Exchange Act of 1934, Rule 10b–5, the Texas Securities Act, and the Virginia Securities Act, must therefore be denied. *TSC Industries, Inc. v. Northway, Inc., supra* at 449–50, 96 S.Ct. at 2132. Further, whatever Mr. Woodson told Mr. Phillips about the Landstreet offer could not have misled Mr. Phillips. Mr. Phillips well knew—far more than Mr. Woodson—the intimate details of the Landstreet negotiations since Equitable was the "third party" on whose behalf and at whose instigation Landstreet was dealing.

**IV**

Having held that defendants Equitable (Gulf Life), Phillips, Boddiger, and Eslinger are liable to the plaintiff under § 10(b) of the Securities Exchange Act of 1934, Rule 10b–5 promulgated thereunder, § 20 of the Securities Exchange Act of 1934, and the Texas Securities Act, the Court will proceed to determine what relief is appropriate. Plaintiff, both in its original and amended complaint, sought rescission of the stock transaction or, alternatively, damages in an amount reflecting the difference between American General's sale price of $32.50 per share and the eventual cash merger price of $51.00 per share.

■ Plaintiff asserts that the contract to sell the shares was void under § 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b), because of the misrepresentations and omissions which have been found to have been present.[59] The instant contract, however, was not illegal *per se*, rather the fraud which formed the basis for this action was collateral to the contract; the contract was therefore not void *ab initio*, but was voidable at the option of the injured party plaintiff, American General. *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 386–88, 90 S.Ct. 616, 622–23, 24 L.Ed.2d 593 (1970)[60]; *Occidental Life Insurance Co. v. Pat Ryan & Associates, Inc.,* 496 F.2d 1255, 1265–67 (4th Cir.), *cert. denied,* 419 U.S.

---

**59.** Section 29(b) of the 1934 Act provides, in pertinent part, as follows:

> [e]very contract made in violation of any provisions of this title [15 U.S.C. §§ 78a *et seq.*] or of any rule or regulation thereunder . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract . . . . .

15 U.S.C. § 78cc(b).

**60.** The Court in *Mills* observed:

> We do not read § 29(b) of the Act, which declares contracts made in violation of the Act or a rule thereunder "void * * * as regards the rights of" the violator and knowing successors in interest, as requiring that the merger be set aside simply because the merger agreement is a "void" contract. This language establishes that the guilty party is

precluded from enforcing the contract against an unwilling innocent party, but it does not compel the conclusion that the contract is a nullity, creating no enforceable rights even in a party innocent of the violation. The lower federal courts have read § 29(b) . . . as rendering the contract merely voidable at the option of the innocent party.

> This interpretation is eminently sensible. The interests of the victim are sufficiently protected by giving him the right to rescind; to regard the contract as void where he has not invoked that right would only create the possibility of hardships to him or others without necessarily advancing the statutory policy of disclosure.

396 U.S. at 386–88, 90 S.Ct. at 623 (citations omitted).

1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974); see 6 L. Loss, Securities Regulation at 3784 (Supp. to 2d ed. 1969); *contra Myzel v. Fields*, 386 F.2d 718, 742 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968).

▪ Plaintiff elected to rescind the contract and recover its shares of stock, as set forth in its complaint filed on 12 June 1978, some five months after the occurrence of the events forming the basis for the plaintiff's claim for relief and approximately two months after Equitable's fraudulent conduct must be considered to have become a matter of public record.[61] A party seeking rescission under § 10(b) is "required to act with reasonable dispatch after it had either actual knowledge of the fraud or notice of facts which, in the exercise of due diligence, would have led to knowledge thereof." *Johns Hopkins University v. Hutton*, 488 F.2d 912, 917 (4th Cir. 1973), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974); *accord, Occidental Life Insurance Co. v. Pat Ryan & Associates, Inc., supra* at 1268; *Baumel v. Rosen*, 412 F.2d 571, 574–75 (4th Cir. 1969), *cert. denied*, 396 U.S. 1037, 90 S.Ct. 681, 24 L.Ed.2d 681 (1970). "[R]easonable dispatch," as an aspect of due diligence, is a question of fact to be determined by the trier of fact. *Johns Hopkins University v. Hutton, supra* at 918. Under the facts presented in this case, the Court finds that, at the latest, the plaintiff must be considered to have been apprised of facts which would have led to actual knowledge of the defendant's fraudulent conduct as of 14 April 1978, the date

on which Equitable announced its agreement in principle with Great Southern. The commencement of this action within two months after this announcement establishes the "reasonable dispatch" required. *Id.* Plaintiff timely demanded rescission.[62]

▪ Rescission, however, is a remedy which presupposes that the parties can be restored to the *status quo ante. Baumel v. Rosen, supra* at 574–75. Some of the courts which have considered rescission as a remedy in securities fraud cases have not similarly analyzed the prerequisites for such relief. *Compare Baumel v. Rosen*, 283 F.Supp. 128, 144–48 (D.Md.1968), *aff'd as to liability, rev'd as to issue of rescission*, 412 F.2d 571 (4th Cir. 1969), *cert. denied*, 396 U.S. 1037, 90 S.Ct. 681, 24 L.Ed.2d 681 (1970) (requirements for rescission consisting of the presence of equitable jurisdiction, the absence of plaintiff's laches, the absence of a change in position and the absence of accretions in value of the subject property not due to the fraud complained of; trial court reversed on rescissional analysis due to plaintiffs' untimeliness in demanding rescission), *with Myzel v. Fields, supra* (violation of Rule 10b–5 renders contract void as a matter of law), *and with Holdsworth v. Strong, supra* ("plaintiff must show [himself] injured and aggrieved"). Defendants proffer ten factors which they argue the Court should consider in evaluating the plaintiff's demand for rescission.[63] Although four factors appear to be irrelevant under the facts of this case, six of these factors present an adequate foundation upon which the Court can base a determina-

---

**61.** See notes 75–78, *infra*, and accompanying text.

**62.** Arnold S. Jacobs defines rescission as "the act of voiding a prior relationship." 5B Jacobs, *supra* at § 260.03[c][vi] at 11–41. *See* note 68, *infra*. Professor Loss sets forth "the elements [permitting] rescission, in a nutshell . . . [as] 'misrepresentation' of a 'material' 'fact', on which the . . . [seller] 'relied.'" 3 L. Loss, Securities Regulation at 1627 (2d ed. 1967).

**63.** Defendants cite ten factors as follows:

is the fraud collateral to the contract as opposed to the contract being for an illegal purpose; in which direction does the balancing of the equities point; what does the public interest suggest; how long before the judgment did the fraud occur; how many changes in position have taken place since the fraudulent transaction; were those changes serious; what are the interests of the third parties; is the transaction difficult to rescind; was the fraudulent transaction fair; and are damages adequate relief.
*See* 5B Jacobs, *supra* at § 260.03[c][vi] at 11–47, 48 (1979).

tion whether rescission or rescission-based relief should be granted.[64]

With regard to a *balancing of the equities*, the Court finds no equities in favor of defendants. The purchase price paid by Gulf United was discounted because of the pendency of this action. Whether or not Gulf United accurately predicted the outcome and thus fully protected itself by discounting, it was in possession of the facts set forth in the complaint yet proceeded with merger. All the equities favor plaintiff.

The *public interest* in this case likewise suggests that where a stockholder seller is the victim of deliberate violations of § 10(b) the Securities Exchange Act of 1934, and Rule 10b–5 promulgated thereunder, the victim should be allowed to avail himself of such remedy as will make violations of the Act unprofitable, so long as his election of such remedy is timely made. 15 U.S.C. § 78cc(b); *Mills v. Electric Auto-Lite Co., supra.* Since the requisites have been met the restoration of the *status quo ante* would be instructive to and, hence, beneficial to the general public.

Regarding *intervening serious changes in position*, this factor is no bar to rescission since, as noted by the plaintiff, all subsequent changes in position made by Equitable or Gulf United of whatever seriousness, were made consciously and with full knowl-

---

**64.** The issue of whether the fraud is collateral to the contract is irrelevant insofar as the remedy of rescission is concerned, once liability under § 10(b) of the Securities Exchange Act of 1934 is found; the issue of collateralness is significant only insofar as § 29(b) of the Act would void the contract automatically as opposed to permitting the injured party the option of voiding it. *See Mills v. Electric Auto-Lite Co., supra.*

The issue of the length of time before judgment that the fraud occurred is likewise irrelevant under the facts of this case. The general rule of rescission, where the Court utilizes the monetary equivalent of specific restitution known as rescissional damages, is that the fair value of that which the plaintiff exchanged as a result of the fraud complained of is measured as of the date of judgment. *Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1342 (9th Cir. 1976) (Sneed, J., concurring); *Myzel v. Fields, supra* at 742; 5B Jacobs, *supra* at § 260.03[c][vi][1] at 11–54, 55. Under the facts of this case, however, involving shares of stock which were retired by the corporate defendant upon fraudulent reacquisition, a corporation no longer in existence, and substantial fluctuation in the value of the shares at issue during the interim, valuation as of the date of judgment is impossible. Instead, the Court may utilize the approach suggested in *Myzel* for such situations, which would value the shares according to the facts of the individual case. *Myzel v. Fields, supra* at 743; *see also* Note, *The Measure of Damages in Rule 10b–5 Cases Involving Actively Traded Securities,* 26 Stan.L.Rev. 371, 372 (1974). Accordingly, the Court may value the plaintiff's shares at the highest value attained within a reasonable time after public disclosure of the facts previously misrepresented and calculate plaintiff's damages upon rescission as of the date of the defendants' fraud. Thus, assuming that rescission is otherwise appropriate, the time elapsed between the fraud complained of and judgment in favor of the plaintiff establishes no element of prejudice to the defendant which will preclude plaintiff's timely elected remedy of rescission.

The issue of the fairness of the fraudulent transaction, in the context of intentional and knowing violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 is irrelevant insofar as the application of the remedy of rescission is concerned; such an argument misapprehends the spirit of the federal securities laws—the protection of public investors from fraudulent, deceptive conduct in the marketplace resulting in artificial stock pricing and unethical business practices. Defendants, as plaintiff has noted, concede that this factor, even assuming that it is relevant to this case, is satisfied under the facts presented.

Finally, the issue of what relief is most appropriate upon a finding of liability under the § 10(b) of the Securities Exchange Act of 1934 and § 581–33(B) of the Texas Securities Act is also irrelevant to a defrauded plaintiff's election to rescind. A contract such as the instant one to sell stock, entered into as a result of misrepresentation and deliberate concealment of material facts, is not illegal *per se*, but rather is voidable at the option of the injured party. *Mills v. Electric Auto-Lite Co., supra*; *Occidental Life Insurance Co. v. Pat Ryan & Associates, Inc., supra.* Once rescission is timely elected by the injured party the existence of other adequate remedies is of no consequence. *Occidental Life Insurance Co. v. Pat Ryan & Associates, Inc., supra*; *Johns Hopkins University v. Hutton, supra*; *Baumel v. Rosen, supra.* When the plaintiff timely elects the remedy of rescission, the defrauding defendant cannot later be allowed to select a differing remedy which he argues is more adequate for the defrauded plaintiff. *E. g. Holdsworth v. Strong, supra* at 697.

edge of the plaintiff's then-outstanding demand for rescission.

No *third-party interests* are present which will be prejudiced unfairly by the granting of rescission. As the plaintiff notes, defendant Equitable/Gulf Life's sole shareholder is Gulf United. Gulf United was a party to the merger agreement between Gulf Life and Equitable.[65] When the merger agreement was entered into, Gulf United, a non-party to this action, was aware of the nature and extent of the plaintiff's claims. A value for the claim was deducted from the purchase price. Therefore, defendant's assertion that Gulf United will in some manner be penalized unfairly as Gulf Life's sole shareholder is misplaced. *See Holmes v. Bateson*, 583 F.2d 542, 560–61 (1st Cir. 1978), *quoting, Myzel v. Fields, supra* at 749.[66]

■ Whether the *transaction is difficult to rescind* is a factor which the Court must consider in determining the precise method and amount of recovery under rescission due the plaintiff; where the property which was the subject of the actionable conduct no longer exists, the Court may decree that a money substitute take the place of the specific property which the plaintiff seeks to recover. *See Gottlieb v. Sandia American Corp.*, 304 F.Supp. 980, 990 (E.D.Pa. 1969), *rev'd in part on other grounds*, 452 F.2d 510 (3d Cir.), *cert. denied, sub nom. Wechsler v. Gottlieb*, 404 U.S. 938, 92 S.Ct. 274, 30 L.Ed.2d 250 (1971). Thus, viewed in this light, the difficulty with which this particular transaction may be unwound is

not material to a consideration of the timely elected remedy of rescission. *See* D. Dobbs, Law of Remedies § 9.4 (1973).

■ The remedy of rescission, having been demanded timely by the plaintiff and otherwise appearing to the Court to be an appropriate remedy in this case will therefore be granted. There remains the determination of an appropriate form of rescissional relief.

The parties admit that specific restitution of the shares of stock is not possible in this case. Upon the purchase of the Equitable shares, Equitable retired plaintiff's stock as treasury shares. Following the merger with Gulf Life, Equitable ceased to exist; thus, the plaintiff cannot be restored to its previous position as a 9.9 percent shareholder in Equitable.

The plaintiff further cannot be granted 315,000 shares of Gulf United $3.78 cumulative convertible preferred stock, Series B, the offering which formed the stock portion of the exchange offer for Equitable, under a tracing or constructive trust theory. To so decree would permit the plaintiff to receive the benefit of the final merger price without having established that it would have retained the stock or, had it retained its shares until the final offer, that the merger would have occurred at the rate of exchange offered by Gulf United with the plaintiff's shares then outstanding. *See Gerstle v. Gamble-Skogmo, Inc.*, 298 F.Supp. 66, 100 (E.D.N.Y.1969), *modified on other grounds and aff'd*, 478 F.2d 1281 (2d Cir. 1973).

---

65. *See* notes 1–2, *supra*, and accompanying text.

66. One of the cornerstones of corporate law is that a corporation is responsible for the acts and omissions of its agents, officers, and employees acting under the corporate . . . [banner] . . . . [O]ne of the essential attributes of a corporation is its continuing existence as an entity despite changes in control and ownership. . . . The corporation may, of course, have a right of indemnification from the malfeasors, but it cannot escape its primary liability to the party defrauded. In discussing the liability of a successor corporation in a 10b–5 case, the Eighth Circuit stated:

> The fact that bona fide public stockholders might indirectly be prejudiced by the corporation's payment of indebtedness incurred by a predecessor corporation is not persuasive. Stockholders are presumed to invest with knowledge of proper corporate liabilities. If any harm exists by reason of the corporation's legal liabilities wrongfully caused by its officers or directors, such damage can be corrected through proper proceedings.
> *Myzel v. Fields*, 386 F.2d 718, 749 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 . . . (1965) [sic].
> *Holmes v. Bateson, supra* at 560–61.

This same hiatus precludes an award to the plaintiff at $51.00 per share. Had the plaintiff proven that its anticipated course of conduct under these facts would have been to hold onto its shares until the final merger of Equitable, irrespective of a rising and attractive market price, it is almost certain that the ultimate merger price would not have been at the exchange rate which Gulf United paid.[67] As the Court has found, it is clear that had the plaintiff been possessed of the information withheld, it would not have sold its shares at $32.50 per share in January of 1978; what precise action the plaintiff would have taken in the market which then existed, was not and in fact could not have been established conclusively. *E. g., Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 757–58, 95 S.Ct. 1917, 1935–36, 44 L.Ed.2d 539 (1975) (Powell, J., concurring); *cf., Capital Investments, Inc. v. Bank of Sturgeon Bay*, 430 F.Supp. 534, 537–38 (E.D.Wis.1977), *aff'd without opinion*, 577 F.2d 745 (7th Cir. 1978); McLean, *Private Remedies Under Rule 10b-5*, 20 S.W.L.J. 620, 624 (1966). The Court is satisfied, however, that being sensible of the impending bidding war probability, the plaintiff would have held onto the shares until presented with an opportunity to sell them at their fair value.

In the present case, this Court, sitting as a court of equity, possesses broad remedial power to award the plaintiff the monetary equivalent of rescission as rescissional damages. Such damages are defined as the difference between the fair value of the securities sold less the fair value of the consideration received. *Myzel v. Fields*, 386 F.2d 718, 742–43 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); 5B Jacobs, *supra* at § 260.-03[c][vi][l]; *see* D. Dobbs, *supra* at §§ 9.3–9.4. Rescissional damages relief is consonant with the Supreme Court's observation in *Mills v. Electric Auto-Lite Co., supra*, 396 U.S. at 386, 90 S.Ct. at 622, a case involving a fatally defective proxy statement, that federal courts:

> [i]n selecting a remedy . . . should exercise " 'the sound discretion which guides the determinations of courts of equity,' " keeping in mind the role of equity as "the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims."

Under the facts of the present case, it is precisely this type of "nice adjustment" that the equitable remedy of rescission and the flexible application of that remedy through rescissional damages provides.[68]

---

**67.** *See* notes 39–40, *supra* and accompanying text.

The facts of this case are thus distinguishable from those present in *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402, 411–13 (3d Cir. 1973), *on remand*, 390 F.Supp. 470 (W.D.Pa.1974), *aff'd in part and remanded in part*, 527 F.2d 891 (3d Cir. 1975), *cert. denied*, 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976). In *Rochez*, damages were measured by the *Janigan [v. Taylor*, 344 F.2d 781 (CA1 1965)] standard, approved in *Affiliated Ute*, at the final sale price of the shares by the defrauding purchaser, despite the fact that the defrauding purchaser-defendant argued that the plaintiff's knowledge of an earlier offer for the shares established the dispositive valuation. In *Rochez* the defrauded plaintiff's shares were sold to the defendant personally and not retired as treasury shares. In this case, as found above, had the plaintiff's shares not been repurchased by Equitable and retired as treasury shares, the inevitable merger of Equitable with an appropriate partner would not have been consummated at the exchange rate finally offered and accepted by Gulf United.

**68.** The defendants argue that because the basis of specific restitutionary relief upon a final decree of rescission is the avoidance of unjust enrichment, and because only the individual defendants profited by Equitable's repurchase of the shares at issue by virtue of their status as shareholders of Equitable, *e. g., Thomas v. Duralite Co.*, 386 F.Supp. 698, 726–27 (D.N.J. 1974), *aff'd in part, rev'd in part and remanded*, 524 F.2d 577 (3d Cir. 1975), rescissional damages are unwarranted. The defendants cite Jacobs for this proposition. Jacobs describes the remedy of rescission and its relief mechanisms of specific restitution and rescissional damages as follows:

> Rescission is the act of voiding a prior relationship. Restitution is an exchange of property based on a defendant's unjust enrichment. Specific restitution is the return by the plaintiff to the defendant of the property the plaintiff received from the defendant in the fraudulent transaction and of amounts he received thereafter with respect to that prop-

Section 28 of the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(a) limits the recovery permitted for claims prosecuted under the Act to "actual damages. . . ." 15 U.S.C. § 78bb(a). The Supreme Court, in *Affiliated Ute Citizens* has interpreted this limitation to establish as a measure of damages:

> the difference between the fair value . . . received and the fair value of what . . . would have [been] received had there been no fraudulent conduct, *see Myzel v. Fields*, 386 F.2d 718, 748 (CA8 1967), *cert. denied*, 390 U.S. 951 [88 S.Ct. 1043, 19 L.Ed.2d 1143] (1968), except for the situation where the defendant received more than the seller's actual loss. In the latter case damages are the amount of the defendant's profit. *See Janigan v. Taylor*, 344 F.2d 781, 786 (CA1 1965), *cert. denied*, 382 U.S. 879 [86 S.Ct. 163, 15 L.Ed.2d 120] (1965).

406 U.S. at 155, 92 S.Ct. at 1473. Thus, if the plaintiff's damages, based upon rescission, are not equal to or greater than the profit which accrued to defendants as a result of their fraudulent conduct, the Court will measure the plaintiff's recovery

---

erty, and a similar restoration by the defendant to the plaintiff.

. . . . .

[If the Court grants rescission] the measure of restitution is the amount by which the defendant was unjustly enriched. Hence, the premise of restitution is that the defendant obtained the unjust enrichment from the plaintiff. In contrast, damages focus on compensating the plaintiff for his loss. A plaintiff can obtain restitution even if he cannot show damages with certainty since *restitution is based on the defendant's profit.*

. . . . .

The plaintiff is entitled to *rescissional damages* if specific restitution is unavailable because the defendant does not own and cannot purchase the shares. In other words, a defrauded seller can obtain rescissional damages when specific restitution is not feasible because, for example, the shares the defendant resold were cancelled or cannot be replaced . . . .
The basis for rescissional damages (as for specific restitution) is [likewise] the unjust enrichment the plaintiff bestows on the defendant. . . .

5B Jacobs, *supra* at § 260.03[c][vi] (emphasis supplied). *This analysis confuses the basis for* specific restitutionary relief and the basis for restitution of ill-gained profits. *E. g., Janigan v. Taylor, supra* at 786. It is true that both are founded upon the avoidance of unjust enrichment of the defendant; the precise manner in which this avoidance is effected by these two forms of relief is, however, different.

When a court of equity, upon an appropriate petition, decrees that a contract between the parties be rescinded and that restitution be effectuated, the defendant is directed by the Court to restore to the plaintiff that which the plaintiff had paid or exchanged as a result of the defendant's fraud. A reciprocal restoration by the plaintiff is concomitantly required. This mutual restoration of the respective considerations, returning the parties to the *status quo ante* the transaction, is specific restitution.

Such specific restitution, restitution of the consideration *in specie*, is premised upon and may generally be expected to avoid or destroy unjust enrichment.

The use of rescissional damages as a surrogate for specific restitution where the latter is not feasible does not change the purpose or relief intended to be effected by equity. When the Court in an appropriate case enters a decree of rescission and specific restitution is impossible, rescissional damages may be awarded. Such an award should be the monetary equivalent of specific restitution. The end result in rescissional damages, as in specific restitution, should be that defendant gains naught and plaintiff suffers naught. Where defendant's gains exceed plaintiff's losses, then plaintiff is entitled to the excess.

In this case, as the defendants correctly assert, Equitable did not profit from the fraud perpetrated upon the plaintiff by its officers and directors. The profits in this case inured to Equitable's shareholders. Thus, only the profits gained by the culpable defendant shareholders are or may be subject to the *Janigan* ill-gained profits recovery. Defendant Equitable, however, was the actual purchaser of the shares. *Cf. Thomas v. Duralite Co., supra* at 711. The present case therefore presents an unusual situation: Equitable as a corporate entity purchased the shares; the shares were never resold on behalf of Equitable; instead, the shares were retired as treasury shares; thus, the gains which attended the fraud of Equitable's officers and directors passed through the corporate conduit intact and were enjoyed in their entirety by Equitable's shareholders. Accordingly, although Equitable may not be held to answer for the ill-gotten gain generated by the fraudulent purchase of the plaintiff's stock, it is appropriate to order that Equitable respond in rescissional damages and restore to plaintiff the fair value of that which the plaintiff exchanged by virtue of the fraud perpetrated by Equitable's officers and directors on Equitable's behalf.

by the restitution of the latter amount.[69] In the present case, at argument held on 5 October 1979, plaintiff stipulated that the Court need not examine the ill-gotten profits, if any, to which the named defendants acceded if the plaintiff's loss measured under the first prong of *Affiliated Ute*, here calculated as rescissional damages, exceeded $1,800,000.00; in effect, the plaintiff stipulated that the ill-gotten profits in this case did not exceed that figure.[70] The defendants' similarly stipulated figure was substantially below that of the plaintiff. The Court will therefore proceed to assess rescissional damages in this case, representing plaintiff's actual damages under *Affiliated Ute*, before determining the necessity, if any, of examining further the ill-gotten gain in this case.

■ Turning first to a consideration of the appropriate dates on which to base values for the computation of plaintiff's rescissional damages, the Court notes that the general rule is that the fair value of that which the defrauded seller received is assessed as of the date of the fraudulent transaction, while the fair value of that which the defrauded seller gave up is valued as of the date of judgment. *Myzel v. Fields, supra* at 742; 5B Jacobs, *supra* at § 260.03[c][vi][I]. The defrauded seller gave

up shares of stock which had ceased to exist as of the date of judgment; the shares represented ownership in a corporation which had consummated a merger prior to judgment and was also no longer in existence; the shares of stock fluctuated in value after sale; and the shares were in a block which was possessed of a value attributable to their existence as a block. Under these circumstances the Court cannot assess the fair value of the plaintiff's lost shares as of the date of judgment. Rather the Court will utilize the approach suggested in *Myzel*. The Court will assess the value of the shares according to the particular facts of this case. *Myzel v. Fields, supra* at 743.

■ The date of the fraudulent transaction, 12 January 1978, is inappropriate as an alternative to judgment day because, after 9 January 1978, the date of the misleading press release, the market value of the Equitable shares was artificial. The price which the market reveals during a period after that date [71] was not a price reflective of Equitable's fair value because Equitable had given misleading information to and withheld material information from the market which would have significantly altered the price at which such shares would have been sold. Although reliable market

---

**69.** In *Janigan v. Taylor, supra* Chief Judge Aldrich observed that:

> [I]f the property is not bought from, but sold to the fraudulent party, future accretions not foreseeable at the time of the transfer even on the true facts, and hence speculative, are subject to another factor, viz., that they accrued to the fraudulent party. It may, as in the case at bar, be entirely speculative whether, had plaintiffs not sold, the series of fortunate occurrences would have happened in the same way, and to their same profit. However, there can be no speculation but that the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them.

344 F.2d at 786.

**70.** Ill-gotten gains could be a complex problem in this case. Equitable, as a corporation, gained nothing from the transaction. Immediately before the sale all stockholders (other

than American General) owned 90.1% of Equitable. After the sale the same stockholders owned 100%. The cost to them had been a reduction in Equitable's assets by approximately $10,000,000.00—a sum substantially less than the value of the stock. The subsequent merger purchase netted the remaining stockholders 100% of the purchase price paid for the outstanding shares. The impact of this gain on the individual defendants in their capacities as stockholders would be the measure of the ill-gotten gain aspect of rescissional damages. It is assumed that equity would not require stockholders who were innocent of wrongdoing to, somehow, "disgorge." (Among other impediments to such a judgment, most of them are not before the Court.) Further, it is assumed that equity would not require the culpable stockholders who are before the Court to "disgorge" a sum of money representing the gain of the innocent stockholders consequent to the culpable defendant's venture into fraud.

**71.** *See* note 34, *supra*.

quotations would otherwise be the best means by which to value shares of publicly traded stock, *e. g., Seaboard World Airlines, Inc. v. Tiger International, Inc.,* 600 F.2d 355, 361–62 (2d Cir. 1979); *Harris v. American Investment Co.,* 523 F.2d 220, 226 (8th Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976), in this case the market value for a substantial period of time following 12 January 1978 is unreliable and therefore cannot be so utilized. The Court notes, however, that in the market present on 12 January 1978, the defendants paid an approximately 25% premium over the then-current market price (market price for 100-share lots of stock) for the acquisition of the shares from the plaintiff. This fact is supportive of the ample evidence presented to support the Court's finding that the market value for a ten percent block of stock is not the same value as is reflected in a market quotation based upon the ownership of 100-share lots. Such a block commands a premium over the latter.

The Court has found that defendants were desirous of ridding themselves of the threat of a raider—American General. Defendants claim that it was only this desire that led them to pay a premium for the American General holdings of Equitable Stock. Defendants' claim is too facile. It supposes that their particular reason for buying set the price. But the market price for a 10% block is set by the "10% block market." The particular reason for buying advanced by defendants simply made them willing to pay the market price for a 10% block. The ten percent block of stock independently commanded a premium due to its

usefulness as a building block to an acquisitor and for equity accounting and defendants paid this premium as a result of marketplace necessity. *See generally* Freund and Easton, *The Three-Piece Suitor: An Alternative Approach to Negotiated Corporate Acquisitions,* 34 Bus.Law 1679 (1979).

In *Harris v. American Investment Co., supra,* the Eighth Circuit addressed a similar valuation problem. Attempting to fix the date for valuing stock to assess damages recoverable by a plaintiff who allegedly purchased stock on the basis of fraudulent misrepresentations and non-disclosures, the court observed that normally the date for fixing such values was the date of the fraudulent transaction. Reasoning that where the alleged misrepresentation was made to the market in general, as well as to the plaintiff, the court found that the quoted price of the security was unreliable on the date of the transaction. The solution provided by § 549 of the Restatement of Torts was cited with approval, the court observing that the date of:

> the public discovery of the fraud may be the proper date at which to ascertain damages. . . . [C]ircumstances may disclose that *only then did the market reflect the true value of the stock, unaffected by what is alleged to have been the defendants' continuing fraud* . . . .

523 F.2d at 226 (emphasis supplied).[72]

In *Myzel v. Fields, supra,* however, the Eighth Circuit examined the specific problem of rescissional damages as follows:

> spread belief of other buyers in misrepresentations similar to that made to the person seeking recovery, as when the market price of securities, such as bonds or shares, is the result of widely spread misrepresentations of those who issue or market them. *The fact that the market price is inflated or depressed by the misrepresentations is the important factor making the price fictitious;* it is, therefore, immaterial that the inflated or depressed price does or does not result from the misrepresentations of the same person who made the misrepresentation on which the person seeking recovery relied. In this case if the recipient of the misrepresentation, in reliance upon it, retains the securities ei-

---

**72.** Section 549 of the Restatement of Torts, in pertinent part, measures an injured plaintiff's out-of-pocket damages as:

> the difference between the value of the thing bought, sold or exchanged and its purchase price or the value of the thing exchanged for it. . . .

Restatement of Torts § 549 (1938); *see also* Restatement (Second) of Torts § 549 (1977). The *Comment* to the Second Restatement, § 549, is illustrative of the principle cited in *Harris*:

> [T]he price that determines the value of the article is not necessarily the price that it would bring at the time the sale is made. In many cases this price is due to the wide-

Rescission calls for cancellation of the bargain, and the return of the parties to *status quo ante* ; where this is impossible because of the disposal or retirement of the stock, then equivalent value of the stock at the time of resale (*cf. In re Liebig*, 2 Cir., 255 F. 458 (1918)) or *at the time of judgment* (*cf. Strong v. Repide, supra*, 213 U.S. at 421–422, 29 S.Ct. 521 [at 522]), should be the proper measure of damage. But where there exists no market value of the stock, the stock is no longer in existence, and there clearly has been a fluctuation in value since the time of the original sale, then what restitutional damages are to be awarded must depend upon the facts of the particular case. As stated in Restatement of Restitution § 151:

> "Where a person is entitled to a money judgment against another because by fraud, duress or other consciously tortious conduct the other has acquired, retained or disposed of his property, the measure of recovery for the benefit received by the other is the value of the property at the time of its improper acquisition, retention or disposition, or a higher value if this is required to avoid injustice where the property has fluctuated in value or additions have been made to it."

386 F.2d at 742–43 (footnotes and citations omitted).[73]

Comment (c) to § 151 of the Restatement of Restitution also is instructive on the topic of rescissional damages in this situation:

> Where the subject matter is of fluctuating value, and where the person deprived of it might have secured a higher amount for it had he not been so deprived, justice to him may require that the measure of recovery be more than the value at the time of deprivation. *This is true where the recipient knowingly deprived the owner of his property* or where a fiduciary in violation of his duty used the property of the beneficiary for his own benefit. In such *cases the person deprived is entitled to be put in substantially the position in which he would have been had there not been the deprivation,* and this may result in granting to him an amount equal to the highest value reached by the subject matter within a reasonable time after the tortious conduct. *This is done if he can prove that he probably would have made a sale while the subject matter was at its highest point in value.*

Restatement of Restitution § 151, Comment (c) at 600–1 (1938) (emphasis supplied).[74]

■■■ The Court has found that the market price as of 12 January 1978 was unreliable and not reflective of the fair value of

---

ther as a permanent or temporary investment, their value is determined by their market price after the fraud is discovered when the price ceases to be fictitious and represents the consensus of buying and selling opinion of the value of the securities as they actually are.
Restatement (Second) of Torts § 549, Comment (c) at 110 (1977) (emphasis supplied).

73. It is worthy of note that the words "benefit" and "profit" are not used synonymously. *See* Restatement of Restitution § 1, Comment (b) at 12 (1938). Thus, when § 151 of the Restatement measures the "recovery for the benefit received by the other" this benefit is not ill-gained profit, but merely "possession of or some other interest in money . . . [or] chattels . . . [or the satisfaction of] a debt or . . . duty. . . . " *Id.* In this case, there is a serious question as to whether Equitable profited by the transaction in issue; in fact, it is clear that Equitable did not profit by the stock transaction. There is no question, however, but that, in exchange for approxi-

mately ten million dollars, Equitable received a benefit in the form of an ownership interest in the shares purchased.

74. *See* D. Dobbs, *supra* at § 9.3, p. 616.
The plaintiff who is induced to sell by fraud or deception is in much the same position as the plaintiff whose stock is converted. Only the mechanism by which he is relieved of his property is different. In the case of conversion, the so-called New York rule has proved to be a useful one. This rule, quite similar to the rule of "cover" in sales cases under the UCC, gives the plaintiff the highest value his stock reached between the time he discovered the conversion and a reasonable time thereafter for replacement of the stock.
*Id. See Mitchell v. Texas Gulf Sulphur Co.,* 446 F.2d 90, 104–6 (10th Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971). *Also see* Restatement (Second) of Torts, *supra* at § 927.

100-share lots of Equitable stock, much less reflective of the value of a ten percent block of such stock. The Court now further finds that the effect of the announcement of the Great Southern agreement with Equitable on 14 April 1978 *largely* obviated the effect of the prior fraudulent misrepresentations and concealment and thus provides an appropriate starting point from which to assess the fair value of the plaintiff's shares upon rescission.[75]

The date of Equitable's announcement of the merger agreement with Great Southern establishes the date of public knowledge of Equitable's true merger posture: that is, that Equitable was now "out of the closet" as a willing merger candidate for a negotiated merger acquisition.[76]

Following the agreement in principle with Great Southern, Equitable became the subject of a torrid merger contest. Between 14 April 1978 and 26 June 1978 merger offers were proffered to the management of Equitable at prices up to and finally exceeding $50.00 cash per share.[77] Using

**75.** The defendants argue that the market extant on 17 April 1978, the first trading day after the announcement of 14 April 1978, was no longer a 100-share lot market but rather was a market dealing in complete control, purportedly responding to the knowledge that Equitable was available in its entirety to the bidder with the right price—a merger market. Thus, argue the defendants, the "$34.00/bid—$36.00/asked" market quotation for 17 April 1978, reflects a market trading only in complete control lots and therefore should be considered by the Court to establish a dispositive stock value for a ten percent block as of that date.

This argument is not compelling, however, in that as plaintiff correctly points out, although the market was on notice as of 14 April 1978 of Equitable's availability as a merger candidate, the market was yet unaware of Equitable's mature and ripened merger posture; Equitable had been preparing to approach the merger table in earnest for months. Two actuarial reports had been prepared; those reports had been selectively utilized in merger negotiations in late 1977 and early 1978 with Liberty National and Southwestern Life, which later permitted Liberty National to precipitate serious competition for Equitable in the late spring of 1978; two offers had been received by Equitable in January of 1978 of which the market was unaware due to the misleading and deceptive press release published in the *Wall Street Journal*; and, closely following the announcement of Equitable's agreement in principle with Great Southern in April of 1978, came the renewed competition of Liberty National, one of the January offerors—not simply competing for Equitable in response to Equitable's agreement with Great Southern, but capitalizing on the knowledge and information gleaned during the merger discussions of late 1977 and early 1978. The information contained in the actuarial appraisals, indeed the existence of the actuarial appraisals, was never disclosed to the market. The subsequent heated contest for Equitable was thus based in significant part upon the material information which had been withheld from the market at an earlier date. Therefore, although 14 April 1978 is a beginning point for the Court's analysis of rescissional damages, the state of knowledge of the market in general was such that that date cannot be considered to be dispositive of the fair value of Equitable as a result of notice of Equitable's availability as a merger candidate.

**76.** *See* Freund and Easton, *The Three-Piece Suitor: An Alternative Approach to Negotiated Corporate Acquisitions, supra.*

As a result [of the target corporation's issuance of a press release detailing the fact of an agreement in principle with an acquiring company], the world is put on notice that the target is up for sale at a time when the parties are *not* contractually obligated to each other. There is nothing to stop any other company interested in acquiring the target from entering the fray.

*Id.* at 1688 (emphasis in original). Indeed, given the widely recognized strengths of Equitable and the independent philosophy which had previously been Equitable's hallmark, the press release signalling the agreement with Great Southern though not so intended, was a mating call to acquisition-oriented companies such as Gulf United and Liberty National.

**77.** On 21 April 1978, Liberty National conveyed a cash offer to Equitable's management at $45.00 per share, including the option of installment notes for low basis shareholders.

On 25 April 1978, Gulf Life conveyed an offer to Equitable's management at $45.00 cash per share, with an option to elect to receive 8½% installment notes instead of the cash.

On 25 April 1978, Gulf United conveyed an offer to Equitable's management at $45.00 cash per share or alternatively an exchange of one share of Gulf United $3.15 cumulative convertible preferred stock per share of Equitable.

On 26 April 1978, Great Southern conveyed an offer to Equitable's management at $45.00 cash per share or alternatively an exchange of one share of Great Southern $3.00 cumulative voting convertible preferred stock per share of Equitable.

On 2 May 1978, Gulf United conveyed an offer to Equitable's management at $47.00 cash

14 April 1978 as the starting point for the analysis of the fair value of plaintiff's shares as of 12 January 1978, the Court is met with the fact that the fair value of Equitable's stock was not reflected in the market price as of 17 April 1978, the first day of trading following the announcement. The market value of that date did not and could not fully reflect a value component for the ownership of the ten percent block held by the plaintiff. Applying the principles set out in *Myzel*, and utilizing the approach of § 151 of the Restatement the Court will value the Equitable shares at the highest value attained within a reasonable time after the announcement on 14 April 1978 of the agreement in principle with Great Southern. *Myzel v. Fields, supra* at 742–43; *Baumel v. Rosen, supra* at 576; Restatement of Restitution, *supra* at § 151.[78]

A reasonable time after 14 April 1978 during which the highest value which the Equitable shares attained may be noted is, the Court believes, two weeks.[79] A reason-

able investor, possessed of the business acumen of American General, would have appreciated the significance of Equitable's agreement in principle with Great Southern and marshalled his forces to recover the lost shareholdings by purchases, thereby covering his loss and establishing his damages conclusively, no later than two weeks after Equitable's announced agreement in principle. *See, e. g., Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1306 at n. 27. Though it is possible that American General may have reacted with greater celerity, doubt as to reaction time should be resolved in its favor.

This two-week period encompasses the time during which Equitable's management received the $45.00 cash offer from Liberty National, the $45.00 cash offer from Gulf Life, the $45.00 cash-and-stock combination offer from Great Southern, and the $45.00 cash-and-stock combination from Gulf United.[80] The closing market quotation for Equitable stock, in 100-share lots, as of 28

---

**78.** As the Supreme Court has noted in *Mills v. Electric Auto-Lite Co., supra*, a federal court: [i]n selecting a remedy . . . should exercise " 'the sound discretion which guides the determination of courts of equity,' " keeping in mind the role of equity as "the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims."

per share or alternatively an exchange of one share of Gulf United $3.375 cumulative convertible preferred stock per share of Equitable.

On 3 May 1978, Liberty National conveyed an offer to Equitable's management at $50.00 cash per share, alternatively proposing a variety of installment note exchanges per share of Equitable.

On 12 May 1978, Gulf United conveyed an offer to Equitable's management at $50.00 cash per share or alternatively an exchange of one share of Gulf United $3.50 cumulative convertible preferred stock for each share of Equitable, and adding a further option of electing an exchange of one-half share of Gulf United common stock and one share of Gulf United $3.50 nonconvertible preferred stock per share of Equitable.

On 24 June 1978, Gulf United conveyed an offer to Equitable at $51.00 cash per share or alternatively an exchange of one share of Gulf United $3.78 cumulative convertible preferred stock per share of Equitable.

396 U.S. at 386, 90 S.Ct. at 622 (citations omitted). In this case, the Court would much prefer to rely upon a market quotation untainted by the fraudulent conduct at issue for a dispositive valuation of the plaintiff's shares. That not being possible, as noted above, the Court must proceed to analyze the fair value of the shares within a reasonable time after the discovery of the fraud.

**79.** In determining that two weeks is such a reasonable time, the Court has considered the sophistication of the plaintiff, the nature of the fraud in this case as being particularly resistant to discovery by the market, the time necessary for the market to react to the disclosure of Equitable's agreement in principle, and the fact that a reacquisition of an approximate ten percent block of Equitable would itself have been, extremely difficult in a market which had recently received disclosures of Equitable's posture for merger. *See, e. g.*, 5B Jacobs, *supra* at § 260.03[c][iii].

**80.** *Id.* What is a reasonable time varies with the facts and circumstances of the case. *See Baumel v. Rosen, supra* at 575–76 (in context of stock split and first offering prices, the "volatile nature" of such prices indicated that one day was reasonable time within which to act); *see also*, 5B Jacobs, *supra* at § 260.03[c][iii].

April 1978 was $42.50 bid and $44.00 asked. *See* defendants' exhibit 518. Normally in such a situation the Court would utilize the average of these two amounts as the dispositive value of the plaintiff's shareholdings. In the present case, however, as an examination of the market quotations reveals, the market price in 100-share lots rose steadily from the time of Equitable's disclosure of the agreement in principle with Great Southern, 14 April 1978, until the announcement of the agreement in principle with Gulf United. *Id.* As the Court has concluded that a ten percent block of Equitable shares in April of 1978 would have commanded a premium over the then-current market price, and as the parties have not proffered to the Court any data on a comparably sized transaction of Equitable shares during this period, and as the remedial focus in the actual damages portion of the rescissional damages analysis is upon the restoration of the defrauded shareholder-plaintiff to the position which he would have held but for the defendant's deception, *see Gerstle v. Gamble-Skogmo, Inc., supra* at 1305; D. Dobbs, *supra* at § 9.4, p. 631; *cf. Zeller v. Bogue Electric Manufacturing*

*Corporation,* 476 F.2d 795, 802 n. 10 (2d Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973), the Court concludes that the plaintiff's shares in Equitable possessed a fair value of $44.00 per share as of 12 January 1978, this fair value including a component for the value of a ten percent block. The Court's decree of rescission and its award to the plaintiff of specific rescissional relief in the form of rescissional damages is based upon the fair value of the plaintiff's shares as of 28 April 1978, the date of the highest market quotation for Equitable shares within a reasonable time after the previously misrepresented state of Equitable's merger status became public knowledge. The Court concludes that the market value on that date correctly portrayed the value as of 12 January 1978. Using this value results in rescissional damages in the amount of $3,622,500.00.[81]

██ As noted above where the ill-gotten gain received by the defrauding defendant as a result of fraud exceeds a plaintiff's actual damages the gain will establish the defrauded plaintiff's recovery.[82] In this case, as previously noted, the plaintiff stipulated that the ill-gotten profits did not

81. This damages figure, based upon rescission, is calculated as follows: $44.00 (fair value per share of plaintiff's Equitable shareholdings as of 12 January 1978) less $32.50 (price per share received by the plaintiff in the stock sale to Equitable in January of 1978) equals $11.50 (rescissional damages per share) times 315,000 (plaintiff's total shareholdings in Equitable as of 11 January 1978) equals $3,622,500.00 (plaintiff's rescissional damages).

The valuation of the plaintiff's shares at $44.00 in light of a market valuation of $44.00 asked and $42.50 bid reflects the Court's perception of the market which existed as of 28 April 1978. The market on that date was a merger market, yet was a market which was not in fact trading in complete control blocks, but rather which was dealing in small, 100-share lots. Therefore, a ten percent block of Equitable would still have commanded a premium over the price at which 100-share lots were trading in the market. The Court concludes that the premium which is accordingly warranted is reflected in the valuation of the shares at $44.00 per share as opposed to valuing the shares at the average between the bid and asked prices.

The market value disclosed as of 28 April. 1978 thus establishes the value of the plaintiff's

shares as of 12 January 1978 had all material facts been disclosed concerning Equitable's merger negotiations and the actuarial appraisals, and had the market been given an opportunity to react to these disclosures. It is true that Equitable's management had before it on 12 January 1978 *all* of the factual information which they misrepresented to and withheld from American General and the market, but Equitable's management on 12 January did not have available to it another factual ingredient, that is the market reaction to the undisclosed facts; therefore the fact that Equitable's management was seriously considering merger with Liberty National and Southwestern Life during the first week in January 1978 within a price range approximating $32.50 per share is not as *significant as it otherwise would be.* The inability of Equitable's management to comprehend the value of its own stock upon its corporate metamorphosis from staid spinsterhood to nubile readiness for merger cannot control the market price determination in computing damages in this action.

82. *See, e. g., Affiliated Ute Citizens, supra; Janigan v. Taylor, supra*; D. Dobbs, *supra* at §§ 9.3–9.4.

exceed $1,800,000.00. The Court having found that plaintiff's actual damages, on rescission, exceeded this figure, whatever ill-gotten profits accrued to these defendants is not a factor.

■ It appears to the Court that an award of prejudgment interest would be fair and just under the facts of this case. *See Blau v. Lehman,* 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962); *Occidental Life Insurance Co. v. Pat Ryan & Associates, Inc., supra* at 1268–69; *Esplin v. Hirschi,* 402 F.2d 94, 105 (10th Cir. 1968), *cert. denied,* 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969); *Holmes v. Bateson, supra* at 1389; *Fox v. Kane-Miller Corp., supra,* 398 F.Supp. at 650-53. The plaintiff was deprived of the productive use of his monies by intentional and deliberate deception orchestrated by defendants Phillips and Eslinger under the tutelage of Bowles and with the knowledge and acquiescence of defendant Boddiger. This award of interest will be calculated as follows: from 12 January 1978 until 12 January 1979, plaintiff will recover interest at the rate of 6½% on $1,811,250.00, that rate of interest being the rate which the plaintiff was willing to accept upon its sale of the shares to Equitable, that period of time representing the length of time for which the plaintiff accepted Equitable's promissory note and the amount representing that proportional amount of rescissional damages herein awarded conforming to that portion of the purchase price which the plaintiff had been willing to finance by Equitable's promissory note[83]; from 12 January 1978 until 12 January 1979, plaintiff will recover interest at the rate of 8% on the remaining $1,811,-250.00, the legal rate of interest on that proportional amount of the plaintiff's damages, on rescission, which conforms to the cash portion of the purchase price for the plaintiff's shares, Va.Code § 6.1–330.10 (Repl. Vol. 1979); from 12 January 1979 until date of judgment, plaintiff will recover interest at the rate of 10% on $3,622,-500.00, that rate being an approximation of the prevailing interest during that period; from date of judgment until paid, defendants shall pay interest at prime.[84]

## V

Although the market in securities might better be served with the common law doctrine of *caveat emptor,* the Congress and the several States have determined that a measure of disclosure is required for a properly functioning exchange. Equitable's merger team chose to disregard these requirements and to mislead American General to its detriment and to their gain. The law prohibits such conduct and directs that the injured party shall recover damages. Judgment will enter accordingly.

## ON MOTION TO AMEND

On 5 May 1980 the Court entered judgment in favor of the plaintiff, American

**83.** The sale by American General to Equitable involved one-half the purchase price being paid in cash and one-half by a one-year promissory note at 6½% interest. *See* notes 24, 26.1, *supra.*

**84.** The plaintiff suggests that the proper method for calculating the rescissional damages award is to go to 12 January 1978 and recompute *all* collateral matters as if no trade occurred until the final merger actually took place in January, 1979. Such a recomputation involves a paper refund of interest on the purchase money note, a paper credit for dividends received on the shares which were sold, and a paper credit for interest received on the cash portion of the purchase price paid by Equitable on 12 January 1978. This approach is unnecessary and is probably inaccurate. If, as the Court has found, an informed market would have paid $44.00 for a ten percent block on 12 January 1978, that price would include a value for anticipated dividends. Further, if interest be computed only on the difference between the price received, $32.50 and the market price of a fully informed market, $44.00 per share, then there need be no paper refund or credit on any portion of the $32.50 purchase price. The cash portion of the purchase price received by American General was rightfully received; the interest on the promissory note received as a portion of the purchase price was interest properly receivable; and the difference of $11.50 would have been properly receivable as of 12 January 1978 had the transaction been free from fraudulent misinformation and omissions.

This footnote is to be read only in the context of computing the sums due as rescissional damages in this particular case, and not as an affirmation of the contract.

General Insurance Company (American General). The judgment was made final by order entered 12 May 1980. On 15 May 1980 defendants Equitable General Corporation (Equitable), Charles E. Phillips, Frank R. Eslinger and George C. Boddiger (collectively the "defendants") filed their Motion to Amend Judgment pursuant to Rule 59(e), Fed.R.Civ.P. The three issues raised by the defendants' Motion to Amend relate to the Court's award of interest to American General. The motion is before the Court and is ripe for determination.

### I

■ The first issue presented by defendants' Motion to Amend relates to whether the date on which prejudgment interest begins to run should be changed from 12 January 1978, the date of the fraudulent transaction, to 28 April 1978, the date utilized to assess the fair value of Equitable stock. Defendants are concerned that the award of prejudgment interest as of 12 January 1978 affords American General a double recovery: American General will receive the accretions in value of the stock from 12 January 1978 to 28 April 1978, plus interest over the same period.

In its judgment order of 5 May, the Court determined that an award of prejudgment interest would be fair and just under the facts of this case to compensate American General for the deprivation of the use of its monies caused by the fraud of the defendants. American General was deprived of the use of its monies as of the date of the fraudulent transfer, 12 January 1978. The Court is of the opinion that the award of prejudgment interest should be commenced as of that date. This is in accordance with the Court's attempt to return the parties to the *status quo ante.*

28 April 1978 was merely the date employed for the assessment of the fair value of the shares of Equitable stock. That the pervasiveness of the defendants' fraud prevented the determination of the fair value of the securities as of January, 1978 should not affect the date from which prejudgment interest begins to run.

Defendants' reliance on *Baumel v. Rosen,* 412 F.2d 571 (4th Cir. 1969), in which the court adopted the date that damages were fixed as the date from which prejudgment interest would run, is not well founded. In *Baumel,* the court determined that the plaintiff was not entitled to rescission but was entitled to damages. This Court has determined that American General is entitled to rescission even though rescission is impracticable. Hence, this Court formulated the remedy of rescissional damages as the monetary equivalent of rescission. As this Court has formulated an equitable remedy, the *Baumel* treatment of prejudgment interest is inapplicable.

Defendants also rely on *Jacobs, The Impact of Rule 10b–5* § 260.03[g] at 11–129, 130 (1980), where the author discusses the impropriety of a double recovery when the plaintiff is awarded windfall damages and the award of prejudgment interest begins to run from the date of the fraudulent transaction. Since the Court determined not to award windfall damages, defendants' reference to Jacobs is also inapplicable.

### II

■ The second issue presented by defendants' Motion to Amend relates to whether the rate of interest awarded from 12 January 1978 until 12 January 1979, on the second $1,811,250.00 portion of plaintiff's damages, should be changed from 8% to 6%, the legal rate of interest in Virginia as set forth in Va.Code § 6.1–330.9 (Repl. Vol.1979).

The Court intended to set the interest rate for this portion of plaintiff's damages at 8% "the judgment rate of interest" in Virginia as set forth in Va.Code § 6.1–330.-10 (Repl.Vol.1979). Accordingly, no change in the judgment is appropriate.

### III

■ The final issue presented by defendants' Motion to Amend relates to whether the post-judgment interest award

should be reduced from 18.5%[1] to 8% in accordance with 28 U.S.C. § 1961 (1976) and Va.Code § 6.1–330.10 (Repl.Vol.1979) or, if not, whether the interest rate should be amended from 18.5% to a fluctuating interest rate corresponding to the prime rate.

28 U.S.C. § 1961 provides:

Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at the rate allowed by State law.

Va.Code § 6.1–330.10 provides "[t]he judgment rate of interest shall be 8% per annum."

Section 1961 explicitly provides that interest shall be allowed on "any money judgment" and that it shall be calculated at the rate allowed by State law. The Court determined, however, that American General was entitled to rescission. Since rescission was impracticable as a result of the action of the defendants, the Court formulated a remedy that was the monetary equivalent of rescission, the equitable remedy of rescissional damages. The Court sees a distinct difference between the remedy of rescission, or rescissional damages, and a money judgment. Had the Court been able to grant rescission, the Court would not have felt constrained by the provisions of 28 U.S.C. § 1961 and Va.Code § 6.1–330.10 from awarding whatever accretions which may have adhered to the securities rather than the 8% judgment rate in Virginia. The application of the provisions of those statutes in rescission might well have allowed defendants to profit from their own wrongdoing. This result would have been contrary to all principles of equity. Thus, the Court does not feel constrained by the provisions of 28 U.S.C. § 1961 and Va.Code § 6.1–330.10 where it makes an award of rescissional damages.

Moreover, the award of post-judgment interest at the prime rate is consonant with the Supreme Court's observation that federal courts:

[I]n selecting a remedy . . . should exercise "the sound discretion which guides the determination of courts of equity," keeping in mind the role of equity as "the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between private claims."

*Mills v. Electric Auto Lite Co.*, 396 U.S. 375, 386, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970).

Having determined that the Court is not limited by State law interest limits in determining rescissional damages interest rates, the Court does not believe that it necessarily follows that the rate determined on the date of judgment be immutable. Given the course of delays and appeals the purpose to be served by the "nice adjustment" of requiring defendants to pay at an interest rate which is at least what they would pay on a voluntary loan, *i. e.* the prime rate, would not be served by a failure to adjust to fluctuations in the prime rate in this period of violent swings in a bewildered economy.

Accordingly, the judgment will be altered to require payment by defendants at the prime rate of interest as it changes from time to time until the affected portion of the judgment is paid in full.

The prime interest rate shall be computed by averaging, on the judgment date, 5 May 1980, the prime rate of interest charged by the three largest commercial banks in Richmond, Virginia (determined on the basis of net worth computed quarterly), and by applying such average prime rate of interest to the judgment for the period of time until one of said banks changes its prime rate of interest. At such time a new average prime rate of interest will be computed as above stated and applied for the period of time until a similar change in the prime interest rate. This method of computation shall continue until the judgment is paid in full.

An appropriate Judgment shall enter.

---

1. The prime interest rate in Richmond, Virginia as of 5 May 1980.